**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

NANCEY SILVERS,
                    *Plaintiff-Appellee,*

           v.

SONY PICTURES ENTERTAINMENT,
INC.,
                    *Defendant-Appellant.*

No. 01-56069

D.C. No.
CV-00-06386-SVW

OPINION

Appeal from the United States District Court
for the Central District of California
Stephen V. Wilson, District Judge, Presiding

Argued and Submitted En Banc
October 12, 2004—San Francisco, California

Filed March 25, 2005

Before: Mary M. Schroeder, Chief Judge, and
Stephen Reinhardt, Pamela Ann Rymer, Andrew J. Kleinfeld,
Susan P. Graber, Kim McLane Wardlaw,
Raymond C. Fisher, Ronald M. Gould, Richard A. Paez,
Marsha S. Berzon, and Carlos T. Bea, Circuit Judges.

Opinion by Judge Graber;
Dissent by Judge Berzon;
Dissent by Judge Bea

## COUNSEL

Ronald L. Rauchberg, Proskauer Rose LLP, New York, New York, and George P. Schiavelli, Reed Smith Crosby Heafey LLP, for the defendant-appellant.

Steven Glaser, Gelfand Rappaport & Glaser, LLP, Los Angeles, California, for the plaintiff-appellee.

Robert H. Rotstein, McDermott, Will & Emery, Los Angeles, California, for the amicus curiae.

## OPINION

GRABER, Circuit Judge:

May an assignee who holds an accrued claim for copyright infringement, but who has no legal or beneficial interest in the

copyright itself, institute an action for infringement? After analyzing the 1976 Copyright Act and its history, as well as the scant, although persuasive, precedent that is available in analogous situations, we answer that question "no." Accordingly, we reverse the ruling of the district court, which allowed this action by the assignee to proceed.

## FACTUAL AND PROCEDURAL BACKGROUND

Nancey Silvers wrote the script of a made-for-television movie called "The Other Woman." Although Silvers wrote "The Other Woman" script, she did not hold the copyright, because "The Other Woman" was a work-for-hire that Silvers completed for Frank & Bob Films II, aka Von Zerneck/ Sertner Films ("Frank & Bob Films"). Frank & Bob Films was the original owner of the copyright to "The Other Woman," and remains so today.

About three years after "The Other Woman" aired on a broadcast network, Sony Pictures Entertainment, Inc., released the motion picture "Stepmom." After the release of "Stepmom," Frank & Bob Films executed an "Assignment of Claims and Causes of Action" in favor of Silvers. Frank & Bob Films retained ownership of the underlying copyright to "The Other Woman" script, but assigned to Silvers "all right, title and interest in and to any claims and causes of action against Sony Pictures Entertainment, Inc., Columbia TriStar, and any other appropriate persons or entities, with respect to the screenplay '*The Other Woman*' . . . and the motion picture '*Stepmom.*' "

Silvers then filed a complaint against Sony for copyright infringement, alleging that the movie "Stepmom" was substantially similar to the script for "The Other Woman." Sony moved to dismiss on the ground that Silvers lacked standing to bring an action for copyright infringement in the absence of some legal or beneficial ownership in the underlying copyright. The district court denied the motion and certified the

issue for interlocutory appeal. *See* 28 U.S.C. § 1292(a) (providing procedure).

A panel of this court affirmed the district court's decision. *Silvers v. Sony Pictures Entm't, Inc.*, 330 F.3d 1204 (9th Cir. 2003). The court then voted to take this case en banc, 370 F.3d 1252 (9th Cir. 2004), withdrawing that opinion.

## STANDARD OF REVIEW

We review de novo the district court's denial of Sony's motion to dismiss. *Glen Holly Entm't v. Tektronix Inc.*, 352 F.3d 367, 368 (9th Cir. 2003). Likewise, we review de novo the district court's resolution of legal issues. *Cal. Satellite Sys. v. Seimon*, 767 F.2d 1364, 1366 (9th Cir. 1985).

## DISCUSSION

A.  *The Statute*

Article I, section 8, clause 8, of the Constitution states: "The Congress shall have Power . . . To promote the Progress of Science and useful Arts by securing for limited Times to Authors . . . the exclusive Right to their . . . Writings . . . ." As is clear from its text, that clause of the Constitution grants no substantive protections to authors. Rather, Congress is empowered to provide copyright protection.

[1] Copyright, therefore, is a creature of statute, and the only rights that exist under copyright law are those granted by statute. As the Supreme Court wrote 170 years ago:

> This right [in copyright] . . . does not exist at common law—it originated, if at all, under the acts of congress. No one can deny that when the legislature are about to vest an exclusive right in an author or an inventor, they have the power to prescribe the conditions on which such right shall be enjoyed . . . .

*Wheaton v. Peters*, 33 U.S. (8 Pet.) 591, 663-64 (1834); *see also Stewart v. Abend*, 495 U.S. 207, 251 (1990) (Stevens, J., dissenting) (stating that copyright is statutorily created); *M. Kramer Mfg. Co. v. Andrews*, 783 F.2d 421, 432 (4th Cir. 1986) ("The right of copyright is a creature of federal statute, with its constitutional base in Article I, § 8, cl. 8."); *Russell v. Price*, 612 F.2d 1123, 1129 n.17 (9th Cir. 1979) ("Common-law copyright is no longer recognized under the [1976] Act . . . ."); *Microsoft Corp. v. Grey Computer*, 910 F. Supp. 1077, 1084 (D. Md. 1995) ("Unlike contracts, copyrights and the rights flowing therefrom are entirely creatures of statute . . . ."). Accordingly, our starting point is the statute.

**[2]** Section 501(b) of the 1976 Copyright Act establishes who is legally authorized to sue for infringement of a copyright:

> The *legal or beneficial owner of an exclusive right under a copyright* is entitled, subject to the requirements of section 411, to institute an action for any infringement of that particular right committed while he or she is the owner of it.

17 U.S.C. § 501(b) (emphasis added). The meaning of that provision appears clear. To be entitled to sue for copyright infringement, the plaintiff must be the "legal or beneficial owner of an exclusive right under a copyright." *See* 4 *Business and Commercial Litigation in Federal Courts*, at 1062, § 65.3(a)(4) (Robert L. Haig ed.) (West Group & ABA 1998) ("If a claimant is not a proper owner of copyright rights, then it cannot invoke copyright protection stemming from the exclusive rights belonging to the owner, including infringement of the copyright.").

**[3]** Section 106 of the 1976 Copyright Act, in turn, defines "exclusive rights":

> (1) to reproduce the copyrighted work in copies or phonorecords;

(2) to prepare derivative works based upon the copyrighted work;

(3) to distribute copies or phonorecords of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease, or lending;

(4) in the case of literary, musical, dramatic, and choreographic works, pantomimes, and motion pictures and other audiovisual works, to perform the copyrighted work publicly;

(5) in the case of literary, musical, dramatic, and choreographic works, pantomimes, and pictorial, graphic, or sculptural works, including the individual images of a motion picture or other audiovisual work, to display the copyrighted work publicly; and

(6) in the case of sound recordings, to perform the copyrighted work publicly by means of a digital audio transmission.

17 U.S.C. § 106. The right to sue for an accrued claim for infringement is not an exclusive right under § 106. Section 201(d) refers to exclusive rights and provides:

(1) The ownership of a copyright may be transferred in whole or in part by any means of conveyance or by operation of law, and may be bequeathed by will or pass as personal property by the applicable laws of intestate succession.

(2) Any of the exclusive rights comprised in a copyright, including any subdivision of any of the rights specified by section 106, may be transferred as provided by clause (1) and owned separately. The owner of any particular exclusive right is entitled, to the extent of that right, to all of the protection and

> remedies accorded to the copyright owner by this title.

17 U.S.C. § 201(d). Exclusive rights in a copyright may be transferred and owned separately, but § 201(d) creates no exclusive rights other than those listed in § 106, nor does it create an exception to § 501(b).

Section 501(b) must also be read in conjunction with § 501(a), which provides that one who "violates any of the exclusive rights of the copyright owner as provided by sections 106 through 122 . . . is an infringer." The definition of an infringer in subsection (a) is parallel to the definition of a proper plaintiff in subsection (b). Common to both subsections is an exclusive copyright interest.

In addition, when a copyright interest is transferred it must be recorded to protect the copyright holder's right to bring an infringement suit. 17 U.S.C. § 205(d); *see* H.R. Rep. No. 94-1476, at 129 (1976), *reprinted in* 1976 U.S.C.C.A.N. 5659, 5744 ("The provisions of subsection (d)[ ] requir[e] recordation of transfers as a prerequisite to the institution of an infringement suit . . . ."). This requirement ensures that prospective buyers or transferees have notice of the copyright interests owned by others. *See* H.R. Rep. No. 94-1476, at 128, *reprinted in* 1976 U.S.C.C.A.N. at 5744 (stating that a copyright recorded in compliance with subsection (c) provides constructive notice of its contents). By contrast, the recording statute does not contemplate a transfer of anything other than an ownership interest in the copyright, along with the concomitant exclusive rights.

Returning to the operative section, under § 501(b) the plaintiff must have a legal or beneficial interest in at least one of the exclusive rights described in § 106. Additionally, in order for a plaintiff to be "entitled . . . to institute an action" for infringement, the infringement must be "committed while

he or she is the owner of" the particular exclusive right allegedly infringed. 17 U.S.C. § 501(b).

**[4]** The statute does not say expressly that *only* a legal or beneficial owner of an exclusive right is entitled to sue. But, under traditional principles of statutory interpretation, Congress' explicit listing of who *may* sue for copyright infringement should be understood as an *exclusion of others* from suing for infringement. The doctrine of *expressio unius est exclusio alterius* "as applied to statutory interpretation creates a presumption that when a statute designates certain persons, things, or manners of operation, all omissions should be understood as exclusions." *Boudette v. Barnette*, 923 F.2d 754, 756-57 (9th Cir. 1991).

There are two particularly important reasons to apply such a presumption here. First, we are mindful of the principle with which we began our discussion: Copyright is a creature of statute, so we will not lightly insert common law principles that Congress has left out. Second, the durational limitation in § 501(b) shows that Congress restricted even the legal or beneficial owner of a copyright; the owner is not entitled to sue unless the alleged infringement occurred "while he or she [was] the owner of it." In other words, Congress' grant of the right to sue was carefully circumscribed.

We think the meaning of § 501(b) is clear, but we recognize that its omission explicitly to address the present question may create an ambiguity. Therefore, we consult legislative history. *See United States v. Daas*, 198 F.3d 1167, 1174 (9th Cir. 1999) ("The first step in ascertaining congressional intent is to look to the plain language of the statute . . . . If the statute is ambiguous . . . courts may look to its legislative history for evidence of congressional intent.").

B. *Legislative History*

**[5]** The 1976 Copyright Act was the result of 15 years of drafting, deliberations, and compromise. *See* H.R. Rep. No.

94-1476. The House Report suggests strongly that Congress intended to limit the class of persons who may sue for infringement:

> Subsection (b) of section 501 enables *the owner of a particular right* to bring an infringement action in that owner's name alone, while at the same time insuring to the extent possible that *the other owners* whose rights may be affected are notified and given a chance to join the action.
>
> The first sentence of subsection (b) empowers the "legal or beneficial owner of an exclusive right" to bring suit for "any infringement of that particular right committed while he or she is the owner of it." A "beneficial owner" for this purpose would include, for example, an author who had parted with legal title to the copyright in exchange for percentage royalties based on sales or license fees.

H.R. Rep. No. 94-1476, at 159, *reprinted in* 1976 U.S.C.C.A.N. at 5775 (emphasis added). Non-owners claiming a bare right to sue, such as Silvers, are not entitled to notice or joinder, which suggests that Congress did not envision their existence, or that the right to sue was a right severable from ownership of one of the authorized exclusive rights.

**[6]** In other words, Congress wanted to ensure that an *owner* of *any exclusive right* in the copyright was entitled to bring a suit for infringement. Congress foresaw a permissible division of exclusive rights; the owner of any one of those exclusive rights may sue, with other owners being entitled to notice and joinder. In this sense, Congress intended to "unbundle" the exclusive rights.

**[7]** Under the 1909 Copyright Act, which was the predecessor of the Copyright Act of 1976, a copyright "proprietor" was the *only* individual who had standing to sue for an

infringement. 17 U.S.C. § 101(b) (1952); *Gardner v. Nike, Inc.*, 279 F.3d 774, 777-78 (9th Cir. 2002). Courts interpreted the 1909 statute as providing a proprietor with an indivisible bundle of rights arising from a copyright—rights that could not be assigned piecemeal. *Id.* at 778. This enforced unity of rights created serious hardships for copyright holders who were interested in assigning the various property rights arising from a copyright separately, for instance selling the motion picture rights in a novel separately from the right to print the novel in book form. *See* Roger D. Blair & Thomas F. Cotter, *The Elusive Logic of Standing Doctrine in Intellectual Property Law*, 74 Tul. L. Rev. 1323, 1366-67 (2000) (discussing history). Congress, aware of these constraints on commercial dealings, largely dispensed with the doctrine of indivisibility in the Copyright Act of 1976. *Id.*; *see also* H.R. Rep. No. 94-1476, at 123, *reprinted in* 1976 U.S.C.C.A.N. at 5738-39 (noting that the right to assign separate property interests in a copyright had "long been sought by authors and their representatives" and had "attracted wide support from other groups"). Although Congress allowed for divisibility of *ownership* interests under a copyright, it did not alter the requirement that *only owners* of an exclusive right in the copyright could bring suit.

[8] The legislative history makes clear, too, that the list of exclusive rights found in § 106 is exhaustive. The House Report states:

> The exclusive rights accorded to a copyright owner under section 106 are "to do and to authorize" any of the activities specified in the five numbered clauses.

H.R. Rep. No. 94-1476, at 61, *reprinted in* 1976 U.S.C.C.A.N. at 5674. If a right is not "specified," then it is not one of the exclusive rights granted by Congress. The House Report that deals with the exclusive rights provided in § 106 also explains that "[e]ach of the five enumerated rights

may be subdivided indefinitely and, . . . in connection with section 201 [governing transfer of rights], *each subdivision* of an exclusive right may be *owned and enforced* separately." *Id.* (emphasis added). In other words, exclusive rights may be chopped up and owned separately, and each separate owner of a subdivided exclusive right may sue to enforce that owned portion of an exclusive right, no matter how small. For instance, A may own the copyright in a book, while B may own the right to develop the book into a screenplay. A may sue an infringer of the book; B may sue an infringer of the screenplay. But only owners of an exclusive right in a copyright may sue. For instance, neither A nor B in the example above could assign an accrued claim for copyright infringement to C if C had no legal or beneficial interest in the copyright.

## C. *Patent Law*

**[9]** We have long noted the strong connection between copyright and patent law: "Where precedent in copyright cases is lacking, it is appropriate to look for guidance to patent law 'because of the historic kinship between patent law and copyright law.'" *Harris v. Emus Records Corp.*, 734 F.2d 1329, 1333 (9th Cir. 1984) (quoting *Sony Corp. of Am. v. Universal City Studios*, 464 U.S. 417, 439 (1984)); *see also Gardner*, 279 F.3d at 780-81 (relying in part on patent law to hold that rights under an exclusive copyright license could not be assigned without the original licensor's consent and holding that assignee lacked standing to sue). Although the Supreme Court has not addressed the issue at hand, it has addressed the question whether a bare assignment can give rise to a cause of action in the context of patent law.

**[10]** The Patent Act of 1952 provides that "[a] patentee shall have remedy by civil action for infringement of his patent." 35 U.S.C. § 281 (1988). Like the 1976 Copyright Act, the Patent Act does not explicitly forbid an assignment of causes of action separate from an assignment of substantive

rights in the protected work. Nonetheless, the Supreme Court has interpreted the Patent Act to provide that *only* a holder of patent rights may sue.

In *Crown Die & Tool Co. v. Nye Tool & Machine Works*, 261 U.S. 24, 26, 33-35 (1923), the Supreme Court considered whether a patent holder could assign its claims for infringement to another party without also transferring rights in the patent. Like the 1976 Copyright Act, the Patent Act that was in force at the time the Supreme Court decided *Crown Die* did not explicitly forbid the assignment of bare causes of action for infringement:

> Every patent or any interest therein shall be assignable in law by an instrument in writing, and the patentee or his assigns or legal representatives may in like manner grant and convey an exclusive right under his patent to the whole or any specified part of the United States.

Pub. L. No. 147, § 6, 42 Stat. 389, 391 (1922) (amending R.S. § 4849). Nevertheless, the Supreme Court held that a bare assignment cannot give rise to a cause of action for infringement. The Court expressed its holding in durational terms that echo 17 U.S.C. § 501(b): "If the owner of the patent when the infringements took place has assigned his patent to one, and his claims for damages for infringement to another, then the latter cannot sue at law at all but must compel his assignor of the claims to sue for him." *Id.* at 44. The Court reasoned:

> "The [patent] monopoly did not exist at common law, and the rights, therefore, which may be exercised under it cannot be regulated by the rules of the common law. It is created by the act of Congress; and no rights can be acquired in it unless authorized by statute, and in the manner the statute prescribes."

*Id.* at 40 (quoting *Gayler v. Wilder*, 51 U.S. (10 How.) 477, 494 (1850)). That text is substantively identical to the Court's

expression of the nature of copyright in *Wheaton*, 33 U.S. at 663-64:

> This right [in copyright] . . . does not exist at common law—it originated, if at all, under the acts of congress. No one can deny that when the legislature are about to vest an exclusive right in an author or an inventor, they have the power to prescribe the conditions on which such right shall be enjoyed . . . .

*Crown Die* effectively creates a presumption that, when we consider standing under a statutory scheme involving intellectual property, common law doctrine does not apply.

[11] Courts continue to read the patent statute to mean that, in general, only a patentee (or an exclusive licensee who possesses all substantial rights in the patent) may institute an action for infringement. *See Prima Tek II, L.L.C. v. A-Roo Co.*, 222 F.3d 1372, 1381 (Fed. Cir. 2000) ("Standing to sue for infringement depends entirely on the putative plaintiff's proprietary interest in the patent, not on any contractual arrangements among the parties regarding who may sue and who will be bound by judgments. . . . [A] 'right to sue' clause cannot confer standing on a bare licensee . . . ."); *Ortho Pharm. Corp. v. Genetics Inst., Inc.*, 52 F.3d 1026, 1030 (Fed. Cir. 1995) ("Thus, the statute requires that the parties to an infringement suit will have the patentee on one side and the accused infringer on the other. Without the patentee as plaintiff, the remedies provided in the patent statute are unavailable except in extraordinary circumstances as where the patentee is the infringer, and cannot sue himself." (internal quotation marks omitted)).

[12] We should interpret the Copyright Act consistently with the requirement of the Patent Act. Despite the differences between patents and copyrights, and between the statutes governing them, the common question is whether a substantive, exclusive right to intellectual property may be

divorced from a cause of action for infringement of that substantive right. Under both copyright and patent law, substantive rights are assignable; the question whether those rights are severable from the entitlement to sue someone for infringing those rights requires a similar analysis. *Crown Die* rejected the centerpiece of the district court's reasoning here, viz.: that because Congress did not expressly proscribe the right to assign a cause of action alone, such a right must exist. Instead, the Court used the same logic that we have applied: No rights exist with respect to patents unless they are created affirmatively by Congress, and courts may recognize only those rights that appear in the statute.

D.   *Cases From Other Circuits*

Last but not least, we turn for guidance to the case law of other courts. Two other circuits have faced questions somewhat similar to the one we confront here. We find the Fifth Circuit's decision under the 1909 Copyright Act to be less persuasive than the Second Circuit's more recent opinion under the 1976 Copyright Act.

In *Prather v. Neva Paperbacks, Inc.*, 410 F.2d 698, 699 (5th Cir. 1969), an author's publisher assigned to the author *both* the copyright to the author's work *and* the accrued causes of action related to the work. When the author sued the publisher for copyright infringement, the publisher claimed that the author lacked standing to sue. *Id.* The Fifth Circuit disagreed and held that the publisher clearly had transferred the right to sue to the author; the author, therefore, could maintain an action for infringement. *Id.* at 700.

*Prather* is unhelpful authority for two reasons. First, it was decided before the 1976 Copyright Act was enacted and thus does not bear on how we should interpret § 501(b). The predecessor to the 1976 Act, the 1909 Act, simply afforded the "proprietor" of a copyright the right to sue for infringement. 17 U.S.C. § 101(b) (1952); *see also* Melville B. Nimmer &

David Nimmer, Nimmer on Copyright § 132 (1976). The 1909 Act did not define "proprietor" or "exclusive rights," nor did it provide that "legal or beneficial owners" of exclusive rights were entitled to sue for infringement. 17 U.S.C. § 101(b) (1952). Those features, missing in the 1909 Act, but present in the 1976 Act, are central to a decision on the present question.

Second, the assignment in *Prather* involved both accrued causes of action *and* some of what we now would call exclusive rights. The contract included an assignment of "all . . . right, title and interest in and to the copyright" of the book involved. *Prather*, 410 F.2d at 699 n.1. Therefore, the *Prather* court was not faced, as we are, with a situation in which the owner of all the exclusive rights and the owner of the accrued causes of action are two different people.

**[13]** The Second Circuit came to a different conclusion under the 1976 Copyright Act. In *Eden Toys, Inc. v. Florelee Undergarment Co.*, 697 F.2d 27 (2d Cir. 1982), *superseded by rule and statute on other grounds*, the court held that one who owns no exclusive right in a copyright may not sue for infringement. The court explained:

> Eden apparently believed that a third basis for standing under the Copyright Act existed, namely authorization by the copyright holder of suit by a person *other* than an exclusive licensee. Clause 9 of the 1975 Eden/Paddington agreement . . . contemplates such an arrangement. We do not believe that the Copyright Act permits holders of rights under copyrights to choose third parties to bring suits on their behalf. While F. R. Civ. P. 17(a) ordinarily permits the real party in interest to ratify a suit brought by another party, the Copyright Law is quite specific in stating that only the "owner of an exclusive right under a copyright" may bring suit.

*Id.* at 32 n.3 (citations omitted).

It is not entirely clear whether the copyright holder in *Eden Toys* had granted to Eden the right to sue on *accrued* causes of action, as is the case here, or only the right to sue prospectively. Whether the assignment was prospective or retrospective, however, the court made plain the basic principle, which we also have derived from § 501(b) and its context and history, that only the owner of an exclusive right under the copyright is entitled to sue for infringement.

A few years later, the Second Circuit decided *ABKCO Music, Inc. v. Harrisongs Music, Ltd.*, 944 F.2d 971, 980 (2d Cir. 1991), a copyright case in which ABKCO had bought *both* the copyright to a song *and* "any and all rights assertable under copyright against the Infringing Composition in any part of the world which may have heretofore arisen or which may hereafter arise." (Internal quotation marks omitted.) Although the infringement in question had occurred before ABKCO bought the copyright, the court held that ABKCO could sue the infringer "not out of its ownership of the copyright, but from its ownership of the claims themselves which it purchased, along with the copyright, in 1978." *Id.* at 981. The Second Circuit made clear that its decision was limited to the situation in which the same entity purchased *both* the copyright *and* accrued claims;[1] the only issue was one of timing, whether ownership of the copyright and occurrence of the infringement had to coincide. The court reaffirmed the principle of *Eden Toys* that a party that has no ownership interest

---

[1] This holding makes perfect sense, as it is consistent with the Act and with the constitutional purpose of encouraging authors and inventors by creating a limited monopoly on their works and inventions. When one acquires a copyright that has been infringed, one is acquiring a copyright whose value has been impaired. Consequently, to receive maximum value for the impaired copyright, one must also convey the right to recover the value of the impairment by instituting a copyright action. Of course, in this sort of commercial transaction the ultimate payment would be calculated minus the costs of suit.

has no standing to sue; "the Copyright Act does not permit copyright holders to choose third parties to bring suits on their behalf." *Id.* at 980.

**[14]** We think it important to parallel the Second Circuit for two reasons. First, and more importantly, our independent analysis leads us to the same conclusion. Second, the creation of a circuit split would be particularly troublesome in the realm of copyright.[2] The Supreme Court has noted "Congress' paramount goal in revising the 1976 Act of enhancing predictability and certainty of copyright ownership." *Cmty. for Creative Non-Violence v. Reid*, 490 U.S. 730, 749 (1989). As we have phrased it, "[c]ongressional intent to have national uniformity in copyright laws is clear." *Syntek Semiconductor Co. v. Microchip Tech. Inc.*, 307 F.3d 775, 781 (9th Cir. 2002). That admonition makes sense, given the nature of intellectual property. Inconsistent rules among the circuits would lead to different levels of protection in different areas of the country, even if the same alleged infringement is occurring nationwide.

## CONCLUSION

**[15]** The bare assignment of an accrued cause of action is impermissible under 17 U.S.C. § 501(b). Because that is all Frank & Bob Films conveyed to Silvers, Silvers was not entitled to institute and may not maintain this action against Sony for alleged infringement of the copyright in "The Other Woman."

REVERSED.

---

[2]*Prather* arose under the 1909 Copyright Act, not under the 1976 Copyright Act. Therefore, we create no split with the Fifth Circuit, which has yet to decide anything about the meaning of 17 U.S.C. § 501(b), a provision that had no direct analogue in the earlier statute.

BERZON, Circuit Judge, with whom REINHARDT, Circuit Judge, joins, dissenting:

I respectfully dissent. Applying the usual mode of analysis used in this circuit for determining whether a statute allows assignment of claims, I would conclude that Nancey Silvers, as the original creator of "The Other Woman," should be allowed to pursue the accrued causes of action that Frank & Bob Films II assigned to her.

Section 501(b) of the 1976 Copyright Act establishes the standing requirement for infringement actions:

> The legal or beneficial owner of an exclusive right under a copyright is entitled, subject to the requirements of section 411, to institute an action for any infringement of that particular right committed while he or she is the owner of it.

17 U.S.C. § 501(b). The majority relies on the notion that "[t]he meaning of that provision appears clear," *ante* at 3615, to conclude that the assignment to Silvers is invalid because she does not own an exclusive right under the copyright. *Ante* at 3627.

The majority opinion, however, is internally inconsistent, provides inadequate support for its conclusion, and ignores our analogous precedents.

1. The inconsistency turns on the majority's citation of § 501(b)'s durational limitation, i.e., that the owner is not entitled to sue unless the alleged infringement occurred "while he or she [was] the owner of [the copyright right]," as evidence of Congress's tight circumscription of persons who have standing to sue. *Ante* at 3617-18. The majority maintains that "Congress' explicit listing of who *may* sue for copyright infringement should be understood as an *exclusion of others* from suing for infringement." *Ante* at 3618.

As the majority later acknowledges, however, the durational limitation is hardly airtight. After a copyright holder sells a copyright, in whole or in part, the new owner may pursue a cause of action that accrued *before* purchase, as long as the cause of action is transferred along with the copyright. *Ante* at 3626, fn.1. The majority maintains that this "makes perfect sense," because "[w]hen one acquires a copyright that has been infringed, one is acquiring a copyright whose value has been impaired," and "[c]onsequently, to receive maximum value for the impaired copyright, one must also convey the right to recover the value of the impairment by instituting a copyright action." *Ante* at 3626, fn.1.

However practical this analysis, the fact remains that it cannot be squared with a literal reading of section 501(b), on which the majority otherwise rests. And, as the language of section 501(b) is *not* necessarily determinative in deciding the viability of assignments of accrued rights to sue for copyright infringement, section 501(b) cannot, absent further analysis, dictate the majority's conclusion that *no* assignment of accrued causes of action without transfer of the underlying copyright is permissible.

2. If the language of § 501(b) is not determinative, then what is? I agree with Judge Bea that the assumption that background common law principles apply with regard to assignment of accrued causes of action applies to the Copyright Act as to other federal statutes. *Post* at 3649-51. I part company with Judge Bea, however, at the point at which he suggests that an entirely free market for accrued causes of action in copyright is the proper antidote to the majority's preclusion of effective transfer of such accrued causes of action. *Post* at 3656. Instead, I would hold that Silvers, given her status as the original creator of the contested "work-for-hire," may pursue the accrued claims assigned by Frank & Bob Films, while a complete stranger to the creative process could not.

Contrary to the majority's strict statutory approach, the question of valid assignment "is appropriate for the develop-

ment of interstitial federal common law [to ensure] harmony with the overall purposes of the [Copyright Act]." *Gulfstream III Assocs. v. Gulfstream Aerospace Corp.*, 995 F.2d 425, 438 (3d Cir. 1993). Our circuit's precedents support approach to the general question of whether claims created by federal statute are assignable. In particular, this circuit's cases deciding whether to enforce assignments of Employee Retirement Income Security Act ("ERISA") claims, which focus on whether "the general goal of the statute would be served by prohibiting the type of assignments involved in th[e] case," *Misic v. Bldg. Serv. Employees Health & Welfare Trust*, 789 F.2d 1374, 1377 (9th Cir. 1986) (per curiam), provide a helpful analog for consideration of Silvers' case.

*Misic* decided that a health care provider, assigned accrued causes of action for health welfare benefits by his patients, could pursue his ERISA lawsuit. Our analysis proceeded in two steps. First, we reviewed the statutory text to decide whether ERISA permitted assignment of the claims for reimbursement of welfare benefits. *Id.* at 1376-77. The statute specifically precludes assignment or alienation of pension benefits, but is silent as to assignment of welfare benefits.[1] We interpreted ERISA's silence on assignment in the welfare benefit plan context, in light of the explicit anti-assignment provision for pension claims, to allow assignment of welfare claims, because "[n]either the specific *purpose* of the anti-

---

[1]ERISA provides:

Assignment or alienation of benefits

    (1)  Each pension plan shall provide that benefits provided under the plan may not be assigned or alienated.

    (2)  For the purposes of paragraph (1) of this subsection, there shall not be taken into account any voluntary and revocable assignment of not to exceed 10 percent of any benefit payment, or of any irrevocable assignment or alienation of benefits executed before September 2, 1974.

29 U.S.C. § 1056(d).

assignment provision nor the *general goal* of the statute would be served by prohibiting the type of assignment involved in [the] case." *Id.* at 1377 (emphases added).

Second, we decided that the assignee, Misic, had standing to sue, even though the statutory provision authorizing suit identified only "participants, beneficiaries, fiduciaries, and the Secretary of Labor" as the parties with standing bring suit.[2] *Id.* at 1378 (citing 29 U.S.C. § 1132(a)). Unlike the majority in this case, we did not consider the statutory language determinative on the question of assignability of accrued causes of action. Instead, we looked to the relevant statute to determine whether the *assignors* had standing, not to decide whether to honor the assignment. We concluded that the assignment was permissible because "Dr. Misic 'st[ood] in the shoes of the [b]eneficiaries;' and Dr. Misic's *assignors*, beneficiaries under the Act [were] expressly authorized by [the statute] to sue to recover benefits due under a plan." *Id.* (emphasis added, second alteration in original).

We took the same general approach, albeit with the opposite result, in *Simon v. Value Behavioral Health, Inc.*, 208 F.3d 1073 (9th Cir. 2000). Although we read *Misic* to allow assignment to healthcare providers, we refused in *Simon* to honor the assignment of claims *from* "health care providers to whom the beneficiaries originally assigned their claims." *Id.* at 1081. *Simon* explains that in *Misic*,

> we granted derivative standing to health care providers *not* because we believed that federal common law on derivative standing trumps the plain language of [the statute]. We granted it because permitting

---

[2]The statute provided, in relevant part: "A civil action may be brought (1) by a *participant or beneficiary* . . . (B) to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a) (emphasis added).

> health care providers to sue in place of the beneficia-
> ries they had treated was consistent with Congressio-
> nal intent in enacting ERISA.

*Id*. Our decision to disallow assignment of claims by health care providers was related to underlying public policy concerns, as "grant[ing] Simon standing would [have] be[en] tantamount to transforming health benefit claims into a freely tradable commodity." *Id*. Predicting that the opposite result "would allow third parties with no relationship to the beneficiary to acquire claims solely for the purpose of litigating them," we declined to recognize the assignment as it was unclear "how such a result would further ERISA's purpose." *Id*.

Both this circuit and others have used similar policy-based analyses in deciding whether assignments of other federal statutory claims were valid. *See, e.g.*, *Simon*, 208 F.3d at 1082-83 (antitrust claim under the Clayton act); *Klamath Lake Pharm. Ass'n v. Klamath Med. Serv. Bureau*, 701 F.2d 1276 (9th Cir. 1983) (considering the background rule that only a real party in interest may prosecute claims in federal court to hold that an assignment was valid); *Pac. Coast Agric. Export Ass'n v. Sunkist Growers, Inc.*, 526 F.2d 1196 (9th Cir. 1975); *see also Tex. Life, Accident, Health & Hosp. Serv. Ins. Guar. Ass'n v. Gaylord Entm't Group*, 105 F.3d 210, 215 (5th Cir. 1997) (using *Misic*'s approach to consider whether "derivative standing to assignees of breach of fiduciary duty claims . . . [would] frustrate ERISA's purpose"). I would do so here as well.

3.   I turn, therefore, to whether Frank & Bob Films' assignment of the accrued cause of action to Silvers, the original creator of "The Other Woman," should be permitted under 17 U.S.C. § 501(b).

As the majority makes clear, Silvers is not the owner of the copyright and therefore would not ordinarily be permitted to

pursue a copyright infringement claim. Following our approach in the ERISA cases discussed above, the relevant inquiry is whether recognition of the assignment to Silvers is consistent with Congress' overall intent in enacting the 1976 Copyright Act.

The basic purpose of copyright is "to *promote* the creation and publication of free expression." *Eldred v. Ashcroft*, 537 U.S. 186, 219 (2003). Congress has struck "a difficult balance between the interests of authors and inventors in the control and exploitation of their writings and discoveries on the one hand, and society's competing interest in the free flow of ideas, information, and commerce on the other hand." *Sony Corp. v. Universal City Studios, Inc.*, 464 U.S. 417, 429 (1984). To achieve that balance, embedded in "the traditional contours of copyright protection," *Eldred*, 537 U.S. at 221, are two major First Amendment protections: (1) as "between ideas and expression . . . only the latter [is] eligible for copyright protection," *id*. at 219; and (2) "the 'fair use' defense allows the public to use not only facts and ideas contained in a copyrighted work, but also expression itself in certain circumstances." *Id*. (citing 17 U.S.C. § 107).

I see nothing in the assignment of accrued claims of Frank & Bob Films for infringement of a work *created* by Silvers *to* Silvers that violates these background principles. Silvers has a significant interest in the infringement of "The Other Woman," as she was the original creator. She might well herself have held the copyright had she not contracted with Frank & Bob Films to create a work-for-hire. Although she relinquished the right to the copyright through her contract with Frank & Bob Films, she maintained an interest in how her work was used. More importantly, Silvers, as the creator, is the person for whom the copyright system is designed to provide incentives for more creations.

In addition, allowing this assignment is consistent with "the need for free alienability and divisibility" of copyright. *Gard-*

*ner v. Nike, Inc.*, 279 F.3d 774, 781 (9th Cir. 2002). It also conforms with "the necessity [of] preserv[ing] the rights and control of . . . owners and creators." *Id.*

Supporting this result is the consideration, discussed above, that section 501(b)'s limitations have not been and should not be read as narrowly as possible. As noted, the majority makes clear that allowing a copyright owner to pursue claims that accrued *before* he held the copyright, once assigned along with the copyright, is eminently sensible. *Ante* at 3626, fn.1. I see no reason why allowing assignment to original creators of copyrighted works without the copyright would any more undermine the delicate balance that Congress has struck. Moreover, as Judge Bea notes, *post* at 3646-47, Congress is perfectly capable of including anti-assignment provisions in federal statutory schemes, but declined to so in the 1976 Act.

I would hold, therefore, that Frank & Bob Films, for whom Silvers completed her work-for-hire, may assign its accrued causes of action related to that work-for-hire to Silvers.

4. The majority places significant weight on *Crown Die & Tool Co. v. Nye Tool & Machine Works*, 261 U.S. 24 (1923), dealing with a somewhat similar question under patent law. The differences between copyright and patent law, and between the nature of the assignment in *Crown Die* and this case, are significant enough to warrant a different result.

In general, "patents and copyrights do not entail the same exchange." *Eldred*, 537 U.S. at 216. "The disclosure required by the Patent Act is 'the *quid pro quo* of the right to exclude.' " *J.E.M. Ag Supply, Inc. v. Pioneer Hi-Bred Int'l, Inc.*, 534 U.S. 124, 142 (2001) (quoting *Kewanee Oil Co. v. Bicron Corp.*, 416 U.S. 470, 484 (1974)). "For the author seeking copyright protection, in contrast, disclosure is the desired objective, not something exacted from the author in exchange for the copyright." *Eldred*, 537 U.S. at 216-17.

These distinctions are reflected in the rules governing suits for infringements of copyrights and patents. Patentees, for example, "should be joined, either voluntarily or involuntarily, in *any* infringement suit brought by an exclusive licensee." *Prima Tek II, L.L.C. v. A-Roo Co.*, 222 F.3d 1372, 1377 (Fed. Cir. 2000) (emphasis added). This scheme differs markedly from that of copyright infringement suits, as a copyright holder may transfer the " 'exclusive' rights to use and to authorize the use of his work in five qualified ways."[3] *Sony Corp.*, 464 U.S. at 433 (citing 17 U.S.C. § 106). Once he does so, "[t]he owner of any particular exclusive right is entitled, to the extent of that right, to all of the protection and remedies accorded to the copyright owner." 17 U.S.C. § 201(d)(2).

With these differences in mind, I do not find the majority's reliance on *Crown Die*, 261 U.S. 24 (1923), persuasive in the current circumstances. The majority states that "*Crown Die* effectively creates a presumption that, when we consider standing under a statutory scheme involving intellectual property, common law doctrine does not apply." *Ante* at 3623. I find no support for such a broad statement, given the significant changes to copyright law since *Crown Die* was decided. Issuance of a copyright no longer "vest[s] *an* exclusive right in an author," *Wheaton v. Peters*, 33 U.S. (8 Pet.) 591, 663 (1834) (emphasis added), but several exclusive rights that the copyright holder may then divide infinitely. Furthermore, unlike an inventor who holds a patent, the original copyright holder need not remain involved in every infringement action brought under a copyright.

In addition, and critically, *Crown Die* dealt with a very different factual scenario than the one we have here. Reed Man-

[3]As the majority notes, *ante* at 3620-21, the 1976 Act's legislative history indicates that "[e]ach of the five enumerated rights may be subdivided *indefinitely* and, . . . each subdivision of an exclusive right may be *owned and enforced separately*." H.R. Rep. No. 94-1476, at 61, *reprinted in* 1976 U.S.C.C.A.N. 5659, 5674 (emphases added).

ufacturing, the patentee of a screw-thread cutting device invented by Wright and Hubbard, assigned its infringement claims against Crown Die & Tool Company to Nye Tool & Machine Works, a competitor of Crown Die. *Crown Die*, 261 U.S. at 25-26. The assignment would have been analogous to the one before us if Reed had assigned its claims to Wright and Hubbard, rather than to a competitor of Crown Die. *Crown Die* did not, therefore, decide the precise question we have before us.

A different result in *Crown Die* would not only have created significant tension with the nature of the monopoly that a patentee holds, but it would have made an accrued cause of action a commodity on an *open* market, permitting assignees *without connection to the patented invention* to pursue infringement claims, "with the sole motive of harassing [infringers]." *Id* at 39. That Nye and Crown Die were competitors could only have reinforced this concern.

The 1976 Act ushered in a new era of copyright law, while leaving in place the general principal goal of copyright: "to *promote* the creation and publication of free expression." *Eldred*, 537 U.S. at 219. I find no reason why Frank & Bob's Films' assignment of accrued claims against Sony to Nancey Silvers does not comport with that goal. I respectfully dissent.

BEA, Circuit Judge, with whom KLEINFELD, Circuit Judge, joins, dissenting:

The question presented in this case is whether an assignee of an accrued cause of action for copyright infringement, who has no legal or beneficial interest in the copyright itself, has standing to sue for copyright infringement. Sony Pictures Entertainment Inc. ("Sony") appeals the district court's order denying its motion to dismiss Nancey Silvers's ("Silvers") claim for copyright infringement under 17 U.S.C. § 501(b) for lack of standing under Fed. R. Civ. P. 12(b)(1). After rehearing en banc, the Majority now holds such assignees do not have standing to sue for copyright infringement and reverses the district court's order denying Sony's motion to dismiss.

I believe that the text, purpose and history of the 1976 Copyright Act ("1976 Act") allow such assignees of an accrued copyright claim to sue for infringement. Accordingly, I respectfully dissent.

## I.

I quite agree with the Majority that the starting point in this case is necessarily the statute under which Silvers brought suit. *See* slip op. at 3615. Section 501(b) of the 1976 Act provides, in pertinent part:

> The legal or beneficial owner of an exclusive right under a copyright is entitled, subject to the requirements of section 411,[1] to institute an action for any infringement of that particular right committed while he or she is the owner of it.

17 U.S.C. § 501(b) (1976).

---

[1]Section 411 provides that no action shall be commenced unless the copyright has been registered. 17 U.S.C. § 411.

Turning to first principles, then, it is well-established that courts should interpret a statute according to its plain meaning. *See United States v. Robinson*, 94 F.3d 1325, 1328 (9th Cir. 1996) ("If the language of a statute is unambiguous, the plain meaning controls."). However, where a statute is ambiguous, courts should consult a statute's legislative history to discern Congressional intent. *See United States v. Daas*, 198 F.3d 1167, 1174 (9th Cir. 1999). Here, as the Majority acknowledges, the statute does not address the present question and is therefore ambiguous.[2] *See* slip op. at 3618 ("[w]e recognize that [Section 501(b)'s] omission explicitly to address the present question may create an ambiguity.").

The key to understanding the legislative history of the 1976 Act, then, is an understanding of the history of standing to sue under copyright law as it existed prior to the 1976 Act. When read in context with copyright law that existed before the 1976 Act, and the portions of the law that were not changed by such Act, a conclusion different from the Majority's reading emerges.

A.  *History of the 1909 Copyright Act*

Under the Copyright Act of 1909 ("1909 Act") (codifying copyright law before the enactment of the 1976 Act), the "proprietor" of a copyright was afforded the right to sue for copyright infringement.[3] 17 U.S.C. § 101(b) (1909). While the

---

[2]Indeed, the language of the statute cannot be all that clear, even to the Majority, since even it eschews "plain meaning" rules of interpretation and recurs to legislative sources. Slip op. at 3618-21.

[3]The 1909 Copyright Act, 17 U.S.C. § 101(b) (1909), provided, in pertinent part:

**§ 101.   Infringement**

If any person shall infringe the copyright in any work protected under the copyright laws of the United States such person shall be liable:

1909 Act did not define the term "proprietor," courts inter-preted that term to mean the "sole owner" of the copyright. *See, e.g.*, *Gardner v. Nike, Inc.*, 279 F.3d 774, 777-778 (9th Cir. 2002) (discussing the general history of the 1909 Act and holding that a sublicensee of a copyright lacked standing to sue under the 1976 Act).

The 1909 Act was predicated on the "doctrine of indivisi-bility." *Id.* at 778. That is, under the Act, a copyright owner possessed an indivisible "bundle of rights" which were "inca-pable of assignment in part." *Id.* Accordingly, assignment under the 1909 Act included "the totality of rights com-manded by copyright." *Id.* Transfer of "[a]nything less than an assignment was considered a license." *Id.* Regardless the particular use of the copyright, "only the copyright *proprietor* (which would include an *assignee* but *not* a *licensee*) had standing to bring an infringement action." *Id.* (emphasis added).

Even though the statute granted standing solely to the "pro-prietor" of the entire copyright, courts nevertheless allowed *assignees* of an accrued cause of action for copyright infringe-ment to sue for infringement of their property rights.[4] *See Prather v. Neva Paperbacks, Inc.*, 410 F.2d 698, 700 (5th Cir. 1969) (assignee of accrued cause of action had standing to sue for copyright infringement); *see also Moran v. London*

***

**(b)    Damages and profits; amount; other remedies.**

To pay to the copyright *proprietor* such damages as the copyright proprietor may have suffered due to the infringement, as well as all the profits which the infringer shall have made from such infringement . . . .

17 U.S.C. § 101(b) (1909) (emphasis added).

[4]In addition, courts denied standing to mere licensees of partial rights or uses of the copyright. *See Prather*, 410 F.2d at 700.

*Records, Ltd.*, 827 F.2d 180, 183 (7th Cir. 1987) (noting that courts applying the 1909 Act held that assignees had standing to sue for copyright infringement). The infringement claim, like any other contingent asset,[5] could be sold, much like the copyright holder's claim against a trade debtor or a coupon clipped from the copyright holder's bond portfolio.

Moreover, all defenses against the assignor were valid against the assignee, who "stood in the shoes" of the assignor. *See T. B. Harms & Francis, Day & Hunter v. Stern,* 231 F. 645, 647 (2d Cir. 1916) (holding that plaintiffs, as assignees of composer's rights under the contract, "stand in [the] shoes" of the assignor and could assert the defense of lack of mutuality of contract). *See also* 17 U.S.C. § 201(d)(2) (1976) ("[t]he owner of any particular exclusive right is entitled, to the extent of that right, to all the protection and remedies accorded to the copyright owner.").

B.   *History of the 1976 Copyright Act*

The 1976 Act was the result of 15 years of debate on proposed legislation and was precipitated by Congress's recognition that the nature of copyrighted works had changed. Congress noted that, during the half-century since the passage of the 1909 Act, "a wide range of new techniques for capturing and communicating printed matter, visual images, and recorded sounds have come into use." H.R. Rep. No. 94-1476 at 159, *reprinted in* 1976 U.S.C.C.A.N. 5659 at 5775. For example, no longer was an opera performed only in a theater, but such a work could be performed in movies, television, videos, records, and other forms. Such technical advances "generated new industries and new methods for the produc-

---

[5]Contingent liability is defined as "an existing condition, situation, or set of circumstances involving uncertainty as to possible gain [ ] or loss [ ] to an enterprise that will ultimately be resolved when one or more future events occur of fail to occur." Statement of Financial Accounting Standards No. 5, Accounting for Contingencies ¶1 (FASB March 1975).

tion and dissemination of copyrighted works, and the business relations between authors and users have evolved new patterns." *Id.*

Toward that end, Congress recognized the commercial need to divide and "infinitely subdivide" copyright uses in recognition of increasing technologically driven varieties of means of reproduction and distribution. Thus, one main purpose of the 1976 Act was, for the first time, to recognize the principle of "divisibility" of uses of a copyright, and the ability to convey the rights to uses separately to various reproducers, which divisible rights did not exist under the 1909 Act. *See* H.R. Rep. No. 94-1476 at 159, *reprinted in* 1976 U.S.C.C.A.N. 5659 at 5775, *infra.*

Congress further recognized that allowing for "divisibility" of the copyright required a mechanism whereby heretofore barred owners of exclusive licenses could now sue for copyright infringement. Accordingly, Congress enacted Section 501 of the 1976 Act to provide access to the courts for the owner of one or more rights to exclusive use, but did not mention the right of the owner of the overall copyright to sue. *See* 17 U.S.C. § 501(b).

Indeed, in providing for the right of *exclusive licensees* to sue, the drafters of the 1976 Act stated:

> *The principle of the divisibility of copyright ownership, established by section 201(d), carries with it the need in infringement actions to safeguard the rights of all copyright owners and to avoid a multiplicity of suits.* Subsection (b) of section 501 enables the owner of a particular right to bring an infringement action in that owner's name alone, while at the same time insuring to the extent possible that the other owners whose rights may be affected are notified and given a chance to join the action.

H.R. Rep. No. 94-1476 at 159, *reprinted in* 1976 U.S.C.C.A.N. 5659 at 5775 (emphasis added).[6]

Far from "suggest[ing] strongly that Congress intended to *limit* the class of persons who may sue for infringement," slip op. at 3619 (emphasis added), the statement above in italics — and omitted from the Majority Opinion — demonstrates that Congress intended to *enlarge* the ability to bring suit to the owners of exclusive rights.[7]

Read in context with provisions of the 1909 Act (to the extent the acts are not inconsistent), and contrary to the Majority's conclusion, the 1976 Act's Section 501(b) was an *enlargement* of infringement action rights. Henceforth, standing was not limited only to the "proprietor"[8] of the original

---

[6]*See also* Testimony of George D. Cary, Copyright Office, Copyright Law Revision Part 4: *reprinted in* George S. Grossman, *Omnibus Copyright Revision Legislative History*, Vol. 3 (2001) ("Committee Report") at 116 (stating that "[s]ubsection (b) provides for the institution of an action by "any owner of an exclusive right. *This section was so worded in an effort to take care of the problem of divisibility.*") (emphasis added). This statement was in reference to Section 35(b) of an earlier draft of the 1976 Act. Like the enacted Section 501(b), Section 35(b) provided that the "legal or beneficial owner" could bring suit. *See* Committee Report at 116-117.

[7]To the extent the statute purports to *limit* those persons able to bring suit, it limits the rights of *non-exclusive* licensees from bringing suit. This is consistent with the purpose of the 1976 Act. *See* Staff of Senate Comm. on the Judiciary, 86th Cong., Study No. 11: Divisibility of Copyrights, 71, Statement of Ralph S. Brown (Comm. Print 1960) ("[a]lleged infringers should probably be protected against multiple suits by nonexclusive licensees."); *See* Staff of Senate Comm. On the Judiciary, 86th Cong., Study No. 11: Divisibility of Copyrights, 71, Statement of Ernest S. Meyers (Comm. Print 1960) ("[t]he law should include a provision permitting an exclusive licensee to sue without joining his grantor; *Provided*, That such a provision is restricted to an exclusive license of enumerated rights.") (emphasis in original).

[8]Note that the 1909 Act did not create a private right of action or give standing to the "proprietor" by any such language as did Section 501(b) of the 1976 Act. *See* 17 U.S.C. §101(b) (1909). Rather, it enumerated the "remedies" which the "proprietor" had under the 1909 Act. As any other "proprietor" — a person owning property — it was implied he had a right to sue for damages to his property.

copyright; a legal or beneficial owner of exclusive rights severed by assignment from the original copyright also had standing to sue for infringement. However, nothing in the 1976 Act eliminated the rights of copyright owners under Section 101 of the 1909 Act to their remedies, nor the right of property owners to enjoy the property rights granted by the statute, including the assignment and enforcement of accrued causes of action.

That, I believe, is the way — and the only way — to read Section 501(b).

## II.

The Majority concludes that because the statute does not *expressly* grant standing to assignees of an accrued cause of action, such persons do not have standing. *See* slip op. at 3618. Rather, the Majority reasons that, applying the maxim of statutory construction *expressio unius exclusio alterius est*, "Congress' explicit listing of who *may* sue for copyright infringement should be understood as an *exclusion of others* from suing for infringement." Slip op. at 3618 (emphasis in original). In my view, the Majority misapplies this maxim of statutory construction.

*First*, such maxims of statutory construction are to be used only when Congressional intent cannot be discerned. Indeed, we have noted:

> Most strongly put, the *expressio unius,* or *inclusio unius,* principle is that '[w]hen a statute limits a thing to be done in a particular mode, it includes a negative of any other mode.' This is a rule of interpretation, not a rule of law. The maxim is 'a product of logic and common sense,' properly applied only when it makes sense as a matter of legislative purpose. . . . [T]he *expressio unius* principle describes what we usually mean by a particular manner of

expression, but does not prescribe how we must interpret a phrase once written. Understood as a descriptive generalization about language rather than a prescriptive rule of construction, the maxim usefully describes a common syntactical implication. 'My children are Jonathan, Rebecca and Seth' means 'none of my children are Samuel.' Sometimes there is no negative pregnant: 'get milk, bread, peanut butter and eggs at the grocery' probably does not mean 'do not get ice cream.' "

*Longview Fibre Co. v. Rasmussen*, 980 F.2d 1307, 1313 (9th Cir. 1992) (internal citations omitted). *See also Nat'l R.R. Passenger Corp. v. Nat'l Ass'n of R.R. Passengers*, 414 U.S. 453, 458 (1974) ("This principle of statutory construction reflects an ancient maxim — *expressio unius est exclusion alterius* . . . But even the most basic general principles of statutory construction must yield to clear contrary evidence of legislative intent."). Here, Congressional intent is readily discernible, and, as demonstrated above, contrary to the Majority's application of the maxim.

*Second*, commentators have noted that the use of maxims of statutory construction such as "*expressio unius*" are problematic insofar as there is no hierarchy of maxims of statutory interpretation. Why choose *expressio unius* rather than another maxim, indeed, the exact opposite: that listing some cases may include others? (*see* fn. 9, *infra*). In his recent book, *A Matter of Interpretation*, Justice Scalia wrote, "[t]he hard truth of the matter is that American courts have no intelligible, generally accepted, and consistently applied theory of statutory interpretation."[9] Antonin Scalia*, A Matter of Inter-*

---

[9]*See* Stephen J. Safranek, *Scalia's Lament*, 8 TEX. REV. L. & POL. 315, 316 (Spring 2004) (noting the lack of hierarchy among maxims of statutory interpretation; "in the cases where judges apply interpretive aids, the aids are often used in isolation and are not necessarily the controlling method by which the statute is interpreted."); *see also* Karl N. Llewellyn,

*pretation*, 14 (1997) (quoting Henry M. Hart, Jr. & Albert M. Sacks, *The Legal Process* 1169 (William N. Eskridge, Jr. & Philip P. Frickey eds., 1994)).

*Third*, while maxims of statutory construction may, indeed, be *helpful* in interpreting statutes, they are not *binding*. The Founders, including Alexander Hamilton, recognized as much. *See* Alexander Hamilton, *The Federalist Papers*, No. 83 at 464 (Clinton Rossiter ed., 1961) ("The rules of legal interpretation are rules of common sense, adopted by the courts in the construction of laws. The true test of a just application of them is its conformity with the source from which they are derived.").

Hence, rather than be guided by a Latin maxim nowhere mentioned by the 1976 Act or our jurisprudence as hierarchically preferable to other means of statutory interpretation, we should be guided by plain legislative intent, which, as our Supreme Court reminds us, trumps the ancient Latin maxim underpinning the Majority Opinion's conclusion. *See Nat'l R.R. Passenger Corp.*, 414 U.S. at 459.

Indeed, it should be noted that where Congress chooses to expressly prohibit assignment, it knows how to do so explicitly. *See, e.g.*, Federal Anti-Assignment Act of 1862, 41 U.S.C. § 15 (expressly prohibiting public contract claims against the U.S. government from being assigned); Federal Assignment of Claims Act of 1940, 31 U.S.C. § 3727 (expressly prohibiting assignment of federal claims against the U.S. government from being assigned); Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C.

---

*Remarks on the Theory of Appellate Decision and The Rules or Canons About How Statutes Are to Be Construed*, 3 VAND. L. REV. 395, 405 (1949-1950) (noting that "there are two opposing canons on almost every point"; and noting that the opposing canon for the *expressio unius exclusio alterius est* is "[t]he language may fairly comprehend many different cases where some only are expressly mentioned by way of example").

§ 1056 (expressly prohibiting the assignment of pension bene-fits). Here, that Congress did not prohibit assignment of infringement claims may well carry a negative pregnant that it intended *not* to prohibit assignment.

A second consideration in statutory interpretation is practi-cality, or put another way, the avoidance of an absurd result. *See Royal Foods Co., Inc. v. RJR Holdings Inc.*, 252 F.3d 1102 (9th Cir. 2001) (courts will not interpret a statute in a way that results in an absurd or unreasonable result). Here, were the statute to be read literally, it would result in absurd or unreasonable results.

It has long been recognized that assignment of the copy-right does not automatically include assignment of accrued causes of action for earlier infringements of the copyright. *See Prather,* 410 F.2d at 700 (" 'a mere assignment of a copyright does not itself transfer to the assignee any cause of action for infringements that occurred prior to the assignment. Unless the assignment of copyright contains language explicitly transferring causes of action for prior infringements, the assignee cannot maintain a suit for infringements which hap-pened before the effective date of the assignment.' ") (internal citations omitted). *See also DeSilva Construction Corp. v. Herrald*, 213 F. Supp. 184, 192 (M.D. Fla. 1962) (holding that the assignment of copyright under 1909 Act does not include the right to sue for "infringements antedating the assignment" and since the assignment as written failed to con-tain such a grant, "no such right is conferred by the assign-ment").

The recognition that the right to an accrued cause of action did not (in the absence of an express contractual assignment of such rights) automatically follow the assignment of the copyright is necessarily a recognition that the two rights should be capable of being separate assets. As separate assets, like any other property right, the two rights can be separately alienated. That much was squarely decided in *Prather*, *supra*.

Similar to the 1909 Act, courts have interpreted the 1976 Act to mean that an assignment of a copyright does not automatically carry with it accrued claims unless such claims are specifically named in the contract of assignment. For example, in *Infodek, Inc. v. Meredith-Webb Printing Co., Inc.*, 830 F. Supp. 614 (N.D. Georgia 1993), in interpreting the 1976 Act, the court held "the case law clearly states that a transfer of interest for accrued damages must be stated in no uncertain terms. It follows that the transfer of interest to past infringements did not pass from [assignor] to [plaintiff assignee] in the first assignment despite the alleged intent to transfer any and all accrued damages." *Infodek*, 830 F. Supp. at 620 (citing *Prather*, 410 F.2d at 700).

The recognition under both the 1909 and 1976 Acts that an accrued cause of action for copyright infringement is an asset separate from the copyright or the exclusive uses of the copyright saves 501(b) from some absurd results.

Read as the Majority does, Section 501 of the 1976 Act converts a claim for relief for infringement into a life estate, by providing a cause of action for copyright infringement but only for the person who owned the exclusive right *at the time of the infringement*. The statute would preclude an assignee of the copyright and accrued causes of action from suing on an accrued cause of action — which infringement, by definition was not "committed while he or she was the owner of it."

The following result would obtain: if a copyright owner instituted suit for copyright infringement ("while he was the owner"), and then assigned the copyright after instituting such suit, the assignee of the copyright *and* the accrued cause of action could not *maintain* such suit, for the assignee was not the owner when the infringement occurred. In addition, the text would have to be read such that when the "he" or "she" who owned the exclusive right at the time of the infringement of the copyright dies, "his" or "her" heirs cannot institute the infringement action, for the same reason.

Luckily, Section 501(b) has not been so interpreted. *See* 17 U.S.C. § 501(b). Rather, the section has been interpreted to *allow* the post-1976 assignee of the accrued cause of action to *maintain* the suit for accrued causes of action. Indeed, courts have recognized that assignees of a copyright may maintain an action instituted by the previous owner during which such previous ownership the infringement claim arose. *See, e.g., ABKCO Music, Inc. v. Harrisongs Music, Ltd.*, 944 F.2d 971 (2d Cir. 1991) (allowing plaintiff to bring suit for copyright infringement that had occurred prior to plaintiff's owning any copyright interest where plaintiff was assigned the right to accrued causes of action); *see also* 17 U.S.C. § 201(d)(2) (1976) ("[t]he owner of any particular exclusive right is entitled, to the extent of that right, to all the protection and remedies accorded to the copyright owner.").

Accordingly, if individuals can bring suit on an accrued infringement claim that did not accrue while he or she was the owner, there is no reason the accrued cause of action cannot be assigned here.

Other fundamental principles lead to the conclusion that Congress did not intend to preclude owners of a bare assignment of accrued causes of action from having standing to bring suit.

*First*, it is well-established that contract rights are assignable at common law. *See Restatement (Second) Contracts* § 317(2)(b) (1979) (contract rights assignable unless the assignment is "forbidden by statute"). *See also TransWorld Airlines, Inc. v. American Coupon Exchange*, 913 F.2d 676, 685 (9th Cir. 1990) (noting that "the presumption is in favor of assignment [of contract]"). Here, the assignment of an accrued cause of action for copyright infringement to an assignee is nothing more than "simple assignment of a chose in action." *See Prather*, 410 F.2d at 699-700.

As a general matter, common law rights existing prior to the enactment of a statute remain in vigor unless *expressly*

*abrogated* by statute. "[S]tatutes which invade the common law . . . are to be read with a presumption favoring the retention of long-established and familiar principles, except when a statutory purpose to the contrary is evident." *United States v. Texas*, 507 U.S. 529, 534 (1993) (holding that states remain subject to common-law prejudgment interest liability where the federal debt collection legislation did not directly speak to the common law right of the federal government to collect prejudgment interest on debts owed to it by the states) (internal quotation marks and citation omitted). Indeed, the Supreme Court recognized that "in such cases, Congress does not write upon a clean slate." *Id.* Rather, "to abrogate a common-law principle, the statute must 'speak directly' to the question addressed by the common law." *Id.* (internal quotation marks and citation omitted).

   That is, courts will not construe a statute "in derogation of common law" unless there is express Congressional intent:

> The courts have consistently held legislation derogative of the common law accountable to an exactness of expression, and have not allowed the effects of such legislation to be extended beyond the necessary and unavoidable meaning of its terms. The presumption runs against such innovation.

*Scharfeld v. Richardson*, 133 F.2d 340, 341 (D.C. Cir. 1942). *See also In re Chateaugay Corp.*, 94 F.3d 772, 779 (2d Cir. 1996) ("there is nothing, either in the language of the statute or in its legislative history, that would lead us to believe that Congress meant the statute to abrogate common law rights of setoff against refunds . . . ."); *Attorney General of Canada v. R.J. Reynolds Tobacco Holdings, Inc.*, 268 F.3d 103, 128 (2d Cir. 2001) (construing civil RICO statute to preserve the common-law doctrine known as the "revenue rule," which prohibits one sovereign from enforcing tax judgments or claims of another sovereign, "absent clear evidence of congressional intent to abrogate it.").

In the case at bar, there is nothing in the 1976 Act which expressly *forbids* the assignment of the basic contract right at issue here.

Accordingly, the Majority errs in reasoning that copyright "is a creature of statute, and the only rights that exist under copyright law are those granted by statute." Slip op. at 3614. *See also* slip op. at 3618. ("Copyright is a creature of statute, so we will not lightly insert common law principles that Congress has left out."). This conclusion is in tension with the principle that common law rights will be deemed to be retained except where there is statutory language and purpose to the contrary. This principle militates in favor of the court's retention of the common law right to assignment of contract. Accordingly, the Majority's reluctance to "insert common law principles" is unfounded here and it errs in abrogating the right to assign contract rights.[10]

*Second*, courts have interpreted other federal statutes which expressly confer standing on certain persons also to grant standing to assignees of the rights. For example, courts have held that assignees of antitrust claims that accrue under the Clayton Antitrust Act, 15 U.S.C. § 15, have standing to sue for antitrust violations. The act provides that "any person who shall be injured" can sue and yet courts have interpreted the statute to confer standing on assignees of antitrust claims. *See, e.g., Gulfstream III Associates, Inc. v. Gulfstream Aerospace Corp.,* 995 F.2d 425, 438-40 (3d Cir. 1993) (Though the Clayton Antitrust Act, 15 U.S.C. § 15, provides that "any person who shall be injured" can sue, antitrust claims are assignable).

---

[10]Although the court in *Crown Die* does not apply the baseline principle that common law rights survive unless expressly abrogated by statute, it does so on the ground that there was express legislative intent that there be no assignment. Here, the legislative history cuts the other way. *See* discussion of *Crown Die*, *infra*.

Other federal statutes have been similarly interpreted. *See, e.g.*, *Lerman v. Joyce Int'l, Inc.*, 10 F.3d 106, 112-113 (3d Cir. 1993) (RICO statute provides that "any person injured in his business or property" may sue; court held that RICO claims are assignable); *see also Misic v. The Building Service Employees Health and Welfare Trust*, 789 F.2d 1374, 1377-78 (9th Cir. 1986) (per curiam) (ERISA statute, 29 U.S.C. § 1056(d), prohibited the assignment of pension benefits, but did not expressly prohibit the assignment of health and welfare benefits; though the statute, 29 U.S.C. § 1132(a), provides that: "A civil action may be brought by *a participant or beneficiary* . . . to recover benefits due to him under the terms of his plan," (emphasis added), health and welfare claims are assignable).

### III.

Next, the Majority argues that the case law that has developed in the area of patent law is analogous here. With respect, it is not. In particular, the Majority asserts that the U.S. Supreme Court's 1923 decision in *Crown Die & Tool Co. v. Nye Tool & Machine Works*, 261 U.S. 24 (1923) (per Taft, C.J.), dealing with the question of whether an accrued cause of action for patent infringement, is analogous and, indeed, controls here. I respectfully disagree.

In *Crown Die*, inventors Wright & Hubbard invented a machine for forming a screw-thread cutting device. *Id.* at 25. Wright & Hubbard assigned the patent to the Reed Manufacturing Company ("Reed"). *Id.* Thereafter, Nye Tool & Machine Works ("Nye Tool"), first obtained from Reed "all claims recoverable in law or in equity, whether for damages, profits, savings, or any other kind or description which the Reed Manufacturing Company has against the Crown Die & Tool Company arising out of the infringement by the Crown Die & Tool Company." *Id.* at 26. Nye Tool then brought suit to prevent Crown Die & Tool Company ("Crown Die"), a tool company and competitor, from using the screw-thread cutting

device. *Id.* at 24. While not stated in the opinion, it stands to reason that plaintiff Nye Tool brought suit under the Patent Act of 1874, which provided that a "patentee, assignee, or grantee" could bring suit for patent infringement.[11]

Crown Die moved to dismiss the complaint on the grounds that Nye Tool did not have standing to bring suit, for Reed owned the patent and had only granted Nye Tool a portion of its rights thereunder. *Id.* at 27. The court of appeals reversed the district court's order granting defendant's motion to dismiss and the U.S. Supreme Court reversed the court of appeals. *Id.* at 36. In reversing the court of appeals and affirming the district court's dismissal of the complaint, Chief Justice Taft reasoned that the common law doctrine of assignment of a cause of action does not apply to patent law because patent law is a creation of statute. *Id.* More specifically, Chief Justice Taft reasoned that the patent right was "created by the act of Congress; and no rights can be acquired in it unless authorized by statute, and in the manner the statute prescribes." *Id.* at 40 (quoting *Gayler v. Wilder*, 51 U.S. 477, 494 (1850)).

In so holding, the court reasoned that there was no legislative intent to permit splitting of the claim from the underlying right because to do so would result in an aftermarket in patent claims.[12] The court reasoned that:

---

[11]The first Patent Act was passed in 1793. *See Diamond v. Chakrabarty*, 447 U.S. 303, 308-09 (1980). Later patent acts were passed in 1836 (5 Stat. 117), 1870 (16 Stat. 198), 1874 (18 Stat. 78) and 1952. *Id.* Presumably, therefore, litigation commenced in or around 1923 would have been brought under the Patent Act of 1874. That Act provided, in pertinent part: "[d]amages for the infringement of any patent may be recovered by action on the case, in the name of the party interested, either as patentee, assignee, or grantee." Patent Act of 1874, 18 Stat. 78, Section 4919. *Accord*, Patent Act of 1952, 35 U.S.C. 281 ("A patentee shall have remedy by civil action for infringement of his patent.").

[12]Indeed, Amicus Curiae in this case, Motion Picture Association of America, Inc., argues this precise point. In its brief, it argues:

> *[I]t was obviously not the intention of the Legisla-
> ture to permit several monopolies to be made out of
> one, and divided among different persons within the
> same limits.* Such a division would inevitably lead to
> fraudulent impositions upon persons who desired to
> purchase the use of the improvement, and would
> subject a party who, under a mistake as to his rights,
> used the invention without authority, to be harassed
> by a multiplicity of suits instead of one, and to suc-
> cessive recoveries of damages by different persons
> in the same place.

*Id.* at 38 (quoting *Gayler v. Wilder*, 51 U.S. 477, 494 (1870))
(internal quotation marks omitted) (emphasis added).

   *First*, in contrast to the Chief Justice's 1923 reading of an
1874 Patent Law, it clearly *was* the intent of the 1976 Legisla-
ture to "permit several monopolies to be made of one," inso-

---

> Should an assignee of nothing more than a naked infringement
> cause of action have standing to sue, the number of copyright
> infringement lawsuits could increase markedly . . . one can envi-
> sion a market developing in which speculators with no relation-
> ship to the copyrighted work pay a small sum to the copyright
> owner — who might have no belief in the merits of an infringe-
> ment claim and no incentive to sue — in exchange for the ability
> to pursue a high volume of nuisance settlements or unwarranted
> jury verdicts.

Brief of Amicus Curiae Motion Picture Ass'n of America, Inc. at 4
(emphasis added).

   Amicus leaves a faint whiff of nostalgia for the restrictions of the Age
of Guilds. Imagine what mischief would ensue if cafes across the street
from the Burbank studios were to be trolled by risk-seeking men clutching
cash. Why, the next thing that would happen would be to allow something
similar to what did happen in London: non-ship owners being paid to take
the risks of shipwreck, and, by subrogation, gaining the right to sue negli-
gent captains and owners, all of this mendacious money-grubbing taking
place at Lloyd's Coffee House!

far as the six individual and separate uses of a single copyright (Section 201(d)) could not only be "divided among different persons," but subdivided infinitely. *See* 17 U.S.C. § 201(d).

*Second*, avoidance of fraud upon purchasers of "several" copyright uses was to be avoided by regulation: copyright registration. *See* 1909 Act, Section 12 (1909) ("no action or proceeding shall be maintained for infringement of copyright in any work until the provisions of this Act with respect to the deposit of copies and registration of such work shall have been complied with").[13] *Accord*, 17 U.S.C. § 411(a) (1976) ("[n]o action for infringement of the copyright in any work shall be instituted until registration of the copyright claim has been made in accordance with this title.").

*Third*, the concern of multiplicity of suits[14] because of several owners of copyright uses seems expressly overcome by allowing suit by the owner of "an" (not "all") exclusive right (§ 501(b)) to bring suit.

Moreover, while the notion of severability of the incidents of ownership of property was in its infancy in 1923 at the time *Crown Die* was decided, such is not the case today. Indeed, the underlying premise upon which the Majority relies is that there should not be an aftermarket in causes of action for copyright infringement. Given the growth of an aftermarket in derivative rights such as puts, calls and credit insurance against bankruptcy risks on corporate debt, the notion that an aftermarket in accrued causes of action for copyright infringe-

---

[13]*See also* 17 U.S.C. § 30 (1952) ([e]very assignment of copyright shall be recorded in the copyright office"); 17 U.S.C. § 205 (1976) ("any transfer of copyright ownership or other document pertaining to a copyright may be recorded in the Copyright Office.").

[14]This has never been made very clear. Why should an alleged patent infringer not be protected against all five partners who owned a patent, if he had a defense judgment of no infringement in an action brought by one of them?

ment is to be prohibited is at best passe and at worst an unwarranted restraint on alienation. *See Bank of America, N.A. v. Moglia*, 330 F.3d 942, 947 (7th Cir. 2003) (Posner, J.) ("restraint[s] on alienation are traditionally disfavored."). Indeed, such limitations, on those able to bring suit, harken back to the Tudor Kings of England who limited inheritance to primogeniture and descent by fee tail.

Here, the market will account for the fact that a copyright holder is selling accrued causes of action and not the underlying copyright. To be sure, prices will fluctuate depending on whether the copyright itself is included.

Finally, while courts have recognized that "[w]here precedent in copyright cases is lacking, it is appropriate to look for guidance to patent law 'because of the historic kinship between patent law and copyright law,' " (*see* slip op. at 3621) (internal citation omitted), courts have also recognized that "[these] two areas of the law, naturally, are not identical twins, and we exercise the caution which we have expressed in the past in applying doctrine formulated in one area to the other." *Sony Corp. of America v. Universal City Studios, Inc.*, 464 U.S. 417, 439 n. 19 (1984). *See also Mazer v. Stein*, 347 U.S. 201, 217-218 (1954) (declining to apply patent law to copyright law due to differences in bodies of law). For these reasons, *Crown Die* does not compel a contrary result here.[15]

## IV.

Unlike circumstances in which the proliferation of lawsuits has been restrained on the basis of public policy, such as the

---

[15]Similarly, the Majority's reliance on *Prima Tek II, L.L.C. v. A-Roo Co.*, 222 F.3d 1372, 1381 (Fed. Cir. 2000) is misplaced. *See* slip op. at 3623. That case does not involve the standing of an assignee of an accrued cause of action under patent law. Rather, the Federal Circuit held that *non-exclusive* licensees of patent right did not have standing to sue. The case is therefore inapposite.

prohibition on assignment of personal injury claims in tort, here there is no reason to prevent the assignment of a copyright claim. Indeed, the court in *Prather* expressly held there was no such public policy. *See Prather*, 410 F.2d at 700 ("[t]here is no public policy against such assignments.").

Courts have upheld restrictions on the assignment of claims where such assignment has been deemed to be in violation of public policy. This anti-assignment policy was rooted in the common law prohibition on champerty.[16] *See, e.g., United Food & Commercial Workers & Employers Arizona Health & Welfare Trust v. Pacyga*, 801 F.2d 1157, 1159 (9th Cir. 1986) (noting that assignment of personal injury claims is prohibited by common law in Arizona); *See also Desenne v. Jamestown Boat Yard, Inc.*, 968 F.2d 1388, 1390 (1st Cir. 1992) (noting that anti-assignment of personal injury claims rooted in prohibition on champerty).

Similarly, courts have held that legal malpractice claims are not assignable for public policy reasons. *See, e.g., Forgione v. Dennis Pirtle Agency, Inc.*, 93 F.3d 758, 760 (11th Cir. 1996) ("[a] majority of jurisdictions prohibit the assignment of [legal malpractice] actions because the personal nature of legal services which involve highly confidential relationships") (internal quotation and citation omitted). Moreover, courts have upheld restrictions on in-person attorney solicitation, enacted to prevent the public's perception of attorneys from falling in further disrepute, as rooted in the common law doctrine of barratry.[17] *See Florida Bar v. Went For It, Inc.*,

---

[16]Champerty is defined as "[a]n agreement between an officious inter-meddler in a lawsuit and a litigant by which the intermeddler helps pursue the litigant's claim as consideration for receiving part of any judgment." *Black's Law Dictionary* (8th Ed. 2004) at 246.

[17]The common law prohibited barratry, which was defined as "the offence of frequently exciting and stirring up quarrels and suits" because such litigation was for the benefit of the promoter rather than for the benefit of the real party in interest. *Vitaphone Corp. v. Hutchinson Amusement Co.,* 28 F. Supp. 526, 530 (D. Mass. 1939).

515 U.S. 618, 626 (1995). *See also Bailey v. Morales*, 190 F.3d 320, 323 (5th Cir. 1999) (legal profession barred from soliciting under ancient doctrine prohibiting barratry).

In addition, courts have upheld restrictions on assignment of certain federal claims where assignment of such claims would result in nuisance suits. For example, in *Smith v. Ayres*, 977 F.2d 946, 950 (5th Cir. 1992), the plaintiff shareholder brought suit under section 10(b) of the Securities Exchange Act of 1934, which provides that "purchasers or sellers" of securities may bring suit. The plaintiff had been granted an express assignment of the claim. The defendant moved to dismiss on the ground that plaintiff lacked standing and the district court granted the motion. The Fifth Circuit affirmed, concluding that such a result was warranted by (1) the fact that "Congress was concerned with blackmail, nuisance, and strike suits, and drafted the act to circumscribe the class of plaintiffs who may sue under the Act for the very purpose of eliminating such suits" and (2) "the evidentiary problems inherent in allowing a non-purchaser or non-seller to bring a Rule 10b-5 action." *Id.* at 950 (internal citations omitted).

None of such policy concerns underlie the Majority's opinion. Nor indeed is there a reasoned policy consideration given for prohibiting suit upon an accrued cause of action for infringement.[18]

## V.

In reaching its conclusion, the Majority argues that this circuit should follow the Second Circuit's decision in *Eden Toys, Inc. v. Florelee Undergarment Co., Inc.,* 697 F.2d 27 (2d Cir. 1982) to avoid the creation of a circuit split. *See* slip op. at 3625-26. In my view, *Eden Toys* is inapposite. To avoid the

---

[18]As noted above, (*see* fn. 7), there *is* a public policy rationale for limiting standing to holders of *exclusive* licensees and prohibiting *non-exclusive* licensees from suing. That rationale, however, is absent here.

creation of a circuit split, this circuit should rather follow the rationale of *Prather*.

A. *Prather v. Neva Paperbacks, Inc.*

In *Prather v. Neva Paperbacks, Inc.*, 410 F.2d 698 (1969), the Fifth Circuit squarely held that an assignee of an accrued cause of action is a proper party to bring suit for copyright infringement. In my view, this case provides persuasive authority that this circuit should follow.

Plaintiff Prather ("Prather") was the author of several books. Prather held the copyright on one of the books and the copyright to the remaining books was held by Prather's publisher, Fawcett Publications. Prather discovered that the copyright on one of the books (the rights to which were owned by Fawcett) had been infringed by book publisher Neva Paperbacks, Inc. ("Neva"). After discovering the infringement, Prather obtained some of the copyright rights and an assignment of all present, past and future causes of action.[19] Significantly, however, Fawcett "simultaneously" with assigning the copyright to Prather, retained an exclusive license to the English language rights for books throughout the world. *Id.* at 699 n.1.

Prather brought suit against Neva for copyright infringement. Neva moved to dismiss, arguing that plaintiff Prather did not have standing to bring suit because Prather was not the "proprietor" of the copyright as required under the 1909 Act. *See* 17 U.S.C. § 101(a) (1952). Rather, Neva argued that because the copyright rights had been "split," Prather was a mere "licensee" and not the sole "proprietor" under Section 101.

---

[19]Prather was assigned "all . . . right, title and interest in and to the copyright" and was further assigned "any and all causes of action that may have heretofore accrued in [the holder's] favor for infringement of said copyright." *Id.* at 699 n.1.

The Fifth Circuit affirmed the trial court's denial of the defendant's motion to dismiss and held that Prather did, in fact, have standing to sue. In so holding, the Fifth Circuit reasoned that the assignment was simply a "simple assignment of a chose in action" — a contract — that contained express language of assignment. *See Prather*, 410 F.2d at 699-700. The court concluded:

> As an assignee of the causes of action for infringement damages past, present and future, Prather has the right to maintain the action under 17 U.S.C.A. [§]§101 *et seq.* For infringement. There is no public policy against such assignments and under F[ED].R.CIV.P. 17 such assignee of all choses in action for infringement, *whether a 'proprietor' or not*, has standing to sue and the court has effective power to avoid altogether the risk of double suit or double recovery.

*Id.* at 700 (emphasis added).

Under *Prather*, then, courts will not require plaintiff to hold ownership of one or more of the exclusive rights of a copyright owner to have standing.

The Majority states that *Prather* is "unhelpful" authority for two reasons: (1) it was decided under the 1909 Act, and not the 1976 Act; and (2) "the assignment in *Prather* involved both accrued causes of action *and* some of what we now call exclusive rights." Slip op. at 3625 (emphasis in original). The Majority argues "the *Prather* court was not faced, as we are, with a situation in which the owner of all the exclusive rights and the owner of the accrued causes of action are two different people." Slip op. at 3625. Neither distinction is persuasive.

*First*, the Majority's attempt to distinguish *Prather* as predicated on the 1909 Act is unpersuasive, given that courts have

recognized that "[i]n enacting § 501(b)'s standing provision, Congress 'merely codified the case law that had developed [under the 1909 Act] with respect to the beneficial owner's standing to sue.' "[20] *Moran v. London Records, Ltd.*, 827 F.2d 180, 183 (7th Cir. 1987) (internal citation omitted). *See also Gardner,* 279 F.3d at 778 (9th Cir. 2002) (holding that a sub-licensee of a copyright lacked standing to sue under the 1976 Act on the ground that the pre-1976 law so prohibited).[21] *Accord*, H.R. 94-1476 at 47, *reprinted in* 1976 U.S.C.C.A.N. 5659, 5660 ("[t]he present copyright law, title 17 of the United States Code, is basically the same as the act of 1909.").

*Second*, that Prather owned rights to the books (other than the English language rights), Neva argued, made Prather a *licensee* of book rights — *not* the *owner* of what we would now call "exclusive rights." An assignee could not be the *owner* of book rights because the "exclusive right" to republish could not be split away from the copyright under the 1909 Act; that is precisely what the 1976 Act changed. Licensees did not have standing to bring suit under the 1909 Act. Therefore, Prather, as a (mere) licensee, could not have had stand-

---

[20]Indeed, Congress relied upon this principle in drafting another section, Section 201(a). *See* 17 U.S.C. § 201(a) ("[c]opyright in a work protected under this title vests initially in the author or authors of the work."). Regarding the provision, Congress stated: "There is [ ] no need for a specific statutory provision concerning the rights and duties of the co-owners of a work; court made law on this point is left undisturbed." H.R. Rep. No. 94-1476 at 121, *reprinted in* 1976 U.S.C.C.A.N. 5659 at 5737.

[21]In *Gardner*, the court concluded:

Although neither party's plain language arguments is dispositive, the fact that Congress chose not to explicitly address this issue in the 1976 Act and the limiting 'protection and remedies' language of § 201(d)(2) indicates that the state of the law remains unchanged. Thus, we hold that the 1976 Act does not allow a copyright licensee to transfer its rights under an exclusive license, without the consent of the original licensor.

*Id.* at 780.

ing to sue *but for* his standing as the assignee of an "accrued cause of action for infringement." *See, e.g., Gardner*, 279 F.3d at 778 ("only the copyright *proprietor* (which would include an *assignee* but *not* a *licensee*) had standing to bring an infringement action.").

Moreover, the assignment to Prather of "some rights" did not *help* Prather establish his right to sue; just the opposite. The fact that he got "some" but not "all" rights of copyright was used by the *defendants* to undermine his standing and was in no sense a grounds used by the *Prather* court to validate the assignment. Indeed, the court rejected this argument and refused to get into the "metaphysical dialectic" of the "button game" of determining who had the copyright. *Prather*, 410 F.2d at 699.

In my view, to interpret *Prather* as holding that an assignee of an accrued cause of action was required to be an assignee of some rights under the copyright would be a profound misreading of the case. Rather than essential to establish standing, having (only) some rights made out what defendant Neva urged as an affirmative defense.

B.   *Eden Toys, Inc. v. Florelee Undergarment Co., Inc.*

By contrast, the Second Circuit's decision in *Eden Toys, Inc. v. Florelee Undergarment Co., Inc.*, 697 F.2d 27 (2d Cir. 1982) involves a different factual situation and thus is entitled to little weight here.

In *Eden Toys*, Paddington Bear & Company, Ltd. ("Paddington Bear") held the copyright to children's books which featured the fictional character Paddington Bear. *Id.* at 29. In 1975, Paddington Bear entered into an agreement with Eden Toys, Inc. ("Eden Toys"), an American corporation, whereby Eden Toys was granted an exclusive license to use licensor Paddington Bear's copyright and characters in North America. *Id.* In 1980, that agreement was amended to grant

Eden Toys exclusive North American rights to all Paddington products except books, tapes, records, stage plays, motion pictures, radio and television productions. *Id.* at 30. Under the agreement, Paddington Bear retained the right to sue for copyright infringement on Eden Toys' license. *Id.* In particular, the agreement allowed Paddington Bear to sue, or choose not to, but let Eden Toys bring suits on Paddington's behalf.[22] *Id.* at 30 n. 2.

Eden Toys brought suit against Florelee Undergarment Co. ("Florelee"), alleging copyright infringement, and seeking to enjoin Florelee's use of the Paddington Bear image. *Id.* at 31. Florelee moved to dismiss the complaint on the ground that Eden Toys lacked standing to sue under 17 U.S.C. § 501(b) (1976). *Id.* The Second Circuit affirmed the district court's dismissal of the claim, holding that "[the court] do[es] not believe that the [1976] Copyright Act permits holders of rights under copyrights to choose third parties to bring suits on their behalf." *Id.* at 32 n. 3.

The Majority contends that the court in *Eden Toys* "made plain the basic principle, which we also have derived from § 501(b) and its context and history, that only the owner of an exclusive right under the copyright is entitled to sue for infringement." Slip op. at 3626.

---

[22]The EdenToys-Paddington Agreement provided, in pertinent part:

  (a)  In the event that Eden or its licensees shall be exposed to competition, direct or indirect, from infringers of the copyright or trademark rights which are licensed hereunder . . . Paddington shall, at its option, take all necessary legal action to enjoin such infringement and protect Eden and its licensees.

  (b)  In the event such infringement and Paddington's election to take no legal action . . . Eden shall have the right, at its option: (i) to institute appropriate legal action against the infringer . . . .

*Eden Toys*, 697 F.2d at 30 n. 2.

I respectfully disagree. In my view, the holding of *Eden Toys* is far more narrow. The court in *Eden Toys* held that a copyright holder who maintains ownership of the exclusive right to reproduce cannot assign to a third party the bare right to sue *should the copyright holder choose not to do so.* It does not hold that a copyright holder may not assign the accrued cause of action, on which a new owner can sue.

Indeed, the specific contractual agreement between Eden Toys and Paddington Bear did not (as it does here) assign *all* rights to *any* claims, but merely assigned the right to sue where Eden Toys or its licensees was "exposed to competition, direct or indirect, from infringers of the copyright or trademark rights which are licensed hereunder." *Id.* at 30 n.2. There was no assignment to Eden Toys of pre-existing accrued causes of action. Accordingly, there was no real "assignment" of any accrued cause of action. Rather, the Eden-Paddington Bear agreement was interpreted as an agreement merely designating Eden as the agent for purposes of suit. Thus, *Eden Toys* merely holds that the proper party plaintiff, the "real party in interest," is the owner of the cause of action for infringement, not some hand-picked stand-in.

## C.    *ABKCO Music, Inc. v. Harrisongs Music, Ltd.*

Finally, I respectfully disagree with the Majority's reading of the Second Circuit's decision in *ABKCO Music, Inc. v. Harrisongs Music, Ltd.*, 944 F.2d 971 (2d Cir. 1990). Far from "reaffirm[ing] the principle of *Eden Toys* that a party that has no ownership interest has no standing to sue," as the Majority asserts (slip op. at 3626-27), in my view, the decision clearly holds that copyright ownership is *not* the *sine qua non* of standing, but that assignees of accrued causes of action may sue for copyright infringement.

In 1971, Bright Tunes Music Corporation, which owned the copyright to a song entitled "He's So Fine," sued musician (and Beatles band member) George Harrison and Harrisongs

Music claiming that Harrison's tune "My Sweet Lord" infringed Bright Tunes' copyright. The trial court agreed and ruled in favor of Bright Tunes, but reserved judgment on the issue of damages. *Id.* at 975.

In 1971, at the time Bright Tunes sued Harrison, ABKCO Music, Inc. and its president served as business manager for the Beatles. *Id.* at 975. In 1978, ABKCO purchased all of Bright Tunes' interest in "He's So Fine" including the copyright and "any and all rights assertable under copyright against the infringing composition ("My Sweet Lord") in any part of the world which may have heretofore arisen or which may arise hereafter." *Id.* at 980. Accordingly, ABKCO was substituted as the sole party plaintiff in the action against Harrisongs Music. *Id.* at 975. However, Harrison had claims against ABKCO and its principal Klein which required ABKCO to convey the old Bright Tunes copyright to "He's So Fine" to Harrison on the payment of a sum.

On appeal, ABKCO claimed that if it conveyed the old Bright Tunes "He's So Fine" copyright to Harrison, it could not participate in the 1980 foreign settlements and it would lose its pre-1970 infringement claims.

As concerns us, the dispositive question was a determination of what rights were at issue in the 1980 foreign settlements: ABKCO's *possession* of the copyright to "He's So Fine" or merely its ownership of the infringement *claims*. The Second Circuit held it was merely the ownership of the infringement claims, and held that ABKCO's right to bring the claims derived from its ownership of the accrued infringement claims.

In so holding, the Second Circuit noted that although ABKCO now owned the copyright and the accrued infringement claims, it need not continue to own the copyright to enforce its accrued-in-1970 causes of action for copyright

infringement arising from the 1980 settlement. The court reasoned:

> Hence, the claims had already accrued when ABKCO purchased all of Bright Tunes' rights in "He's So Fine." As a consequence, ABKCO's right to bring the claims arises not out of its ownership of the copyright, *but from its ownership of the claims themselves* which it purchased, along with the copyright, in 1978. We therefore conclude that ABKCO's ownership of the "He's So Fine" copyrights was not a necessary predicate to its participation in the 1980 settlements. ABKCO could participate in the 1980 settlements because it owned the infringement claims accrued in 1970, not because it owned the copyright. Thus, ABKCO's ownership of the copyright was not affected by the 1980 settlements, and ABKCO must surrender the copyright to the Harrison Interests upon proper payment.

*Id.* at 980-981 (emphasis added).

Thus, under the holding in *ABKCO*, ownership of the copyright is not a requirement for the enforcement of accrued claims assigned to the assignee (ABKCO) so long as the claims arose during the period when the assignor (Bright Tunes) was the owner of the copyright. Moreover, ABKCO could continue to assert such accrued copyright infringement claims even though it would be forced to give up the copyright.

According to the Majority, "[t]he Second Circuit [in *ABKCO*] made clear that its decision was limited to the situation in which the same entity purchased both the copyright and accrued claims; the only issue was one of timing, whether ownership of the copyright and occurrence of the infringement had to coincide." Slip op. at 3626. I respectfully disagree. In *ABKCO*, ownership of both the copyright and the

accrued causes of action was merely *coincident* — not *required* — for ABKCO to have standing to sue.

Indeed, ABKCO, like Silvers, did not own the copyright to "He's So Fine" when George Harrison and the Beatles plagiarized it into "My Sweet Lord." The copyright to "He's So Fine" was owned by Bright Tunes; the infringements took place before 1970.

In the case at bar, there is no dispute that Frank & Bob Films II owned the copyright when the alleged Sony infringement took place and that they, like Bright Tunes, assigned those accrued infringement claims to Silvers. Thus, like ABKCO, Silvers has standing to pursue those accrued infringement claims.

Accordingly, I respectfully disagree with the Majority: to avoid the creation of a circuit-split, slip op. at 3626-27, this court should follow the Fifth Circuit's decision in *Prather*, rather than the Second Circuit's decision in *Eden Toys*, as the facts in *Eden Toys* are clearly distinguishable. In addition, in *ABKCO*, a more recent decision, the Second Circuit expressly held that ownership of both the copyright and the accrued causes of action is not necessary for the owner of those claims to bring suit.

## VI.

For the foregoing reasons, I would affirm the district court's denial of Sony's motion to dismiss Silvers' complaint against Sony for the alleged infringement of the copyright of her script, "The Other Woman." I respectfully dissent.