FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| TRESÓNA MULTIMEDIA, LLC, an Arizona limited liability company, *Plaintiff-Appellant/Appellee*, | Nos. 17-56006<br>17-56417<br>17-56419 |
| v. | D.C. No.<br>2:16-cv-04781- |
| BURBANK HIGH SCHOOL VOCAL MUSIC ASSOCIATION; BRETT CARROLL; JOHN DOE CARROLL, a married couple; ELLIE STOCKWELL; JOHN DOE STOCKWELL, a married couple; MARIANNE WINTERS; JOHN DOE WINTERS, a married couple; GENEVA TARANDEK; JOHN DOE TARANDEK, a married couple; LORNA CONSOLI; JOHN DOE CONSOLI, a married couple; CHARLES RODRIGUEZ; JOHN DOE RODRIGUEZ, a married couple, *Defendants-Appellees/Appellants.* | SVW-FFM<br><br>OPINION |

Appeal from the United States District Court
for the Central District of California
Stephen V. Wilson, District Judge, Presiding

Argued and Submitted May 13, 2019
Pasadena, California

Filed March 24, 2020

Before:  Kim McLane Wardlaw and Andrew D. Hurwitz, Circuit Judges, and Edward R. Korman,[*] District Judge.

Opinion by Judge Wardlaw

---

## SUMMARY[**]

---

### Copyright

The panel affirmed the district court's summary judgment in favor of the vocal music director at Burbank High School and other defendants in a copyright suit and reversed the district court's denial of attorneys' fees to defendants.

Tresóna Multimedia, LLC, a licensing company, claimed that the Burbank High School student show choirs failed to obtain licenses for their use of copyrighted sheet music in arranging a show choir performance.  The panel concluded that Tresóna lacked standing under 17 U.S.C. § 501(b) to sue as to three of the four musical works at issue because it received its interests in those songs from individual co-owners of copyright, without the consent of the other co-owners, and therefore held only non-exclusive licenses in those works.

---

[*] The Honorable Edward R. Korman, United States District Judge for the Eastern District of New York, sitting by designation.

[**] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

Affirming in part on different grounds from the district court, the panel held that the defense of fair use rendered the use of the fourth musical work noninfringing. The panel concluded that the educational purpose of the use was an enumerated fair use purpose under 17 U.S.C. § 107. In addition, the purpose and character of the use, which was transformative, weighed strongly in favor of a finding of fair use. The nature of the copyrighted work weighed against fair use because the original arrangement of the song was creative. Neither (1) the amount and substantiality of the portion used nor (2) the effect upon the potential market for or value of the copyrighted work weighed against fair use. The panel stated that it was especially swayed by the limited and transformative nature of the use and the work's nonprofit educational purposes in enhancing the educational experience of high school students. The panel concluded that the music director's use of a small portion of the song, along with portions of other songs, to create sheet music for a new and different high school choir showpiece performance was a fair use.

Reversing in part, the panel held that the district court abused its discretion in denying defendants attorneys' fees under 17 U.S.C. § 505 because defendants prevailed across the board in this action in the district court and won a ruling on their fair use defense on appeal, Tresóna's arguments were objectively unreasonable, and an award of fees would further the purposes of the Copyright Act. The panel therefore awarded defendants' attorneys' fees and remanded to the district court for the calculation of the award.

## COUNSEL

Brad A. Denton (argued), Denton Peterson P.C., Mesa, Arizona, for Plaintiff-Appellant/Appellee.

Scott D. Danforth (argued) and Marlon C. Wadlington, Atkinson Andelson Loya Ruud & Romo, Cerritos, California, for Defendants-Appellees/Appellants Brett Carroll and John Doe Carroll.

A. Eric Bjorgum (argued), Marc Karish, and Vincent Pollmeier, Karish & Bjorgum PC, Pasadena, California, for Defendants-Appellees/Appellants Burbank High School Vocal Music Association, Ellie Stockwell, John Doe Stockwell, Marianne Winters, John Doe Winters, Geneva Tarandek, John Doe Tarandek, Lorna Consoli, John Doe Consoli, Charles Rodriguez, and John Doe Rodriguez.

## OPINION

WARDLAW, Circuit Judge:

In this copyright infringement action against Brett Carroll, the vocal music director at Burbank High School, the Burbank High School Vocal Music Association Boosters Club, and several individual Boosters Club parents, Tresóna Multimedia, LLC claims that the Burbank High School student show choirs failed to obtain licenses for their use of copyrighted sheet music in arranging a show choir performance. We conclude that Tresóna lacks standing to sue as to three of the four musical works at issue, and that the defense of fair use renders the use of the fourth noninfringing. We therefore affirm the district court's grant

of summary judgment in favor of Defendants, but reverse its denial of attorneys' fees to Carroll and the Boosters Club.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

### A.  The Burbank High School Performances Giving Rise to this Suit

Burbank High School's music education program includes instructional classes and five competitive show choirs.  The competitive show choirs—Out Of The Blue, Sapphire, Impressions, Sound Dogs, and In Sync—are "nationally recognized as top competitors in their respective divisions," and reportedly inspired the television series "Glee."  To participate in the show choirs, students "must be enrolled in one of the four music classes offered [by Burbank High School] during the instructional day," and must also make financial contributions to defray expenses, including those for costume rentals, competition entry fees, transportation, choreographers, and professional music arrangers.

Because student contributions do not cover the full costs of the competitive show choirs, and many students at Burbank High School cannot afford to make any financial contributions, the Boosters Club, a registered 501(c)(3) non-profit organization, holds several annual fundraisers at Burbank High School to help cover the show choirs' expenses.  These annual fundraisers include the "Burbank Blast," a show choir competition that features performances by 40 show choirs, as well as the spring "Pop" show, during which the Burbank High School competitive show choirs perform their competition sets.  To generate revenue from these events, the Boosters Club sells entry tickets, as well as advertisements in the event programs.

Brett Carroll is the music director at Burbank High School, where he teaches an instructional day class and directs the show choirs. Carroll also acts as a "teacher liaison/coach" to the Boosters Club. In this capacity, Carroll decides how the funds raised by the Boosters Club are spent and selects the show choirs' choreographers, arrangers, and accompanists. Carroll also decides, with input from parents, which competitions the show choirs will attend during the school year.

Carroll commissioned music arranger Josh Greene, who is not a party to this action, to create custom sheet music for two shows: "Rainmaker" and "80's Movie Montage," performed by the group In Sync. "Rainmaker" is an approximately eighteen-minute performance of stanzas from many musical works, including a rearranged segment of "Magic," a song originally performed by Olivia Newton-John. The "Magic" segment used by In Sync to close out the last two minutes of "Rainmaker" includes a rearranged chorus and small segments from another verse of the song. "80's Movie Montage" is an approximately twenty-minute performance, and incorporates a segment of the song "(I've Had) The Time of My Life" by Bill Medley and Jennifer Warnes. That segment is approximately sixteen seconds of the song's chorus, out of the song's four-minute and twenty-two-second runtime, and is used only once in "80's Move Montage" to transition between other songs. Each show also incorporates small segments of several other musical works, none of which is at issue in this case. In Sync performed these shows on several occasions, including at the Burbank Blast fundraiser and during several student competitions.

After In Sync's performances of "Rainmaker" and "80's Movie Montage," Tresóna, an Arizona-based licensing company, brought copyright infringement claims against

Carroll, the Boosters Club, and parent members of the Boosters Club, alleging infringement of Tresóna's copyright interests in "Magic" and "(I've Had) The Time of My Life." Tresóna also alleged that performances by the Jon Burroughs High School show choirs at the Burbank Blast, which incorporated segments of the songs "Hotel California" and "Don't Phunk With My Heart" violated its copyright interests in those songs. Tresóna alleged that it was "the only authorized issuer in the United States and Canada for the . . . infringed songs," and that Carroll, the Boosters Club, and the parents' use of the songs without obtaining a "custom arrangement license, grand right license, synchronization license, or mechanical license" for them infringed its copyright interests under 17 U.S.C. § 501.

## B.  Tresóna's Copyright Interests

Tresóna acquired its copyright interests in the songs through a series of assignments of those rights. PEN Music Group (PEN), which is not a party to this action,  had "grant[ed] to Tresóna the exclusive, non-transferable right . . . to (i) issue Copyright Use Licenses" for "Magic," "(I've Had) The Time of My Life," and "Hotel California." The relevant contract defines "Copyright Use Licenses" as "Synchronization Licenses, Custom Arrangement Licenses, Grand Rights Licenses, [and] Dramatic Rights Licenses[.]"

PEN, in turn, had been assigned its rights to "Magic" by John Farrar Music (BMI). The contract between PEN and John Farrar Music (BMI) states that PEN "shall solely own each and all of [John Farrar Music (BMI)'s] interest in the musical compositions to the extent that they are written, composed, co-written or co-composed by John Farrar." John Farrar composed the words and music to "Magic," and John Farrar Music is the sole copyright claimant of "Magic," according to the Copyright Office's online public catalog of

registration. Despite this chain of title, however, it is undisputed that Tresóna does not own the public performance rights to "Magic"; rather, John Farrar Music (BMI) has retained those rights, as to which it is the sole owner.

Tresóna failed to provide evidence of its chain of title to "Hotel California." It is undisputed, however, that PEN controlled only co-owner Don Felder's interest in "Hotel California," the rights to which are jointly owned, and only a 25 percent interest in "(I've Had) The Time of My Life." Accordingly, neither PEN nor Tresóna is the sole copyright owner of its purported interests in either song.

As for "Don't Phunk With My Heart," Tresóna was assigned interests from a separate music publisher, The Royalty Network, which is also not a party to this action. The contract between The Royalty Network and Tresóna provides that The Royalty Network "grants to Tresóna the exclusive, non-transferable right . . . to . . . issue Copyright Use Licenses" for "Don't Phunk With My Heart." However, the record evidence shows that "The Royalty Network controls only Kalyanji [Anandji] and Indivar Anandji's interest[s] in 'Don't Phunk With My Heart,'" a work that is jointly owned with six other entities. Therefore, neither The Royalty Network nor Tresóna is the sole copyright owner of its purported interests in "Don't Phunk With My Heart."

## C. District Court Proceedings

Despite the minimal evidence of Tresóna's claim to exclusive rights in these four musical works, Tresóna brought this action against Carroll, the Boosters Club, and the parents, claiming it held exclusive rights in 79 songs, including "Magic," "(I've Had) The Time of My Life,"

"Hotel California," and "Don't Phunk With My Heart."[1] Carroll, the Boosters Club, the parents, and Tresóna cross-moved for summary judgment. The district court granted in part Carroll's motion for summary judgment, holding that Tresóna lacked standing to sue under the Copyright Act for infringement of the songs "(I've Had) The Time of My Life," "Hotel California," and "Don't Phunk With My Heart," because Tresóna held only non-exclusive rights to these works. For Tresóna's claims based on the song "Magic," the district court concluded that Carroll was entitled to qualified immunity from suit, and that the Boosters Club and Boosters Club parents could not be held liable for direct or secondary copyright infringement.

After successfully defending against Tresóna's claims on summary judgment, Carroll and the Boosters Club moved to recover their attorneys' fees under 17 U.S.C. § 505. The district court denied the motions, concluding that Carroll and the Boosters Club had achieved only a minimal level of success on the merits, and that an award of attorneys' fees would not otherwise further the purposes of the Copyright Act.

Tresóna timely appeals the district court's summary judgment orders. Carroll and the Boosters Club appeal the denial of their motions for attorneys' fees.

---

[1] Although Tresóna claimed exclusive rights in its complaint to 79 songs used by the show choirs, Tresóna did not allege copyright infringement as to the remaining 75 songs. Nor did it produce any evidence in the course of the litigation to support its claim of exclusive rights in any of the remaining 75 songs.

## II.  JURISDICTION AND STANDARD OF REVIEW

We have jurisdiction under 28 U.S.C. § 1291.

We review a district court's grant of summary judgment de novo.  *L.A. Printex Indus., Inc. v. Aeropostale, Inc.*, 676 F.3d 841, 846 (9th Cir. 2012). "Summary judgment is appropriate if, viewing the evidence in the light most favorable to the nonmoving party, there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Id.* (internal quotation marks omitted).

We review the district court's denial of attorneys' fees under the Copyright Act for an abuse of discretion. *Shame On You Prods., Inc. v. Banks*, 893 F.3d 661, 665 (9th Cir. 2018).  "A district court abuses its discretion when its decision is based on an inaccurate view of the law or a clearly erroneous finding of fact." *Cadkin v. Loose*, 569 F.3d 1142, 1147 (9th Cir. 2009) (quoting *Traditional Cat Ass'n v. Gilbreath*, 340 F.3d 829, 833 (9th Cir. 2003)).

## III.  STANDING

The district court correctly granted summary judgment on Tresóna's claims of infringement of its rights in the songs "(I've Had) The Time of My Life," "Hotel California," and "Don't Phunk With My Heart" for lack of standing to sue under 17 U.S.C. § 501(b).

Under the Copyright Act of 1976, only "[t]he legal or beneficial owner of an exclusive right under a copyright is entitled . . . to institute an action for any infringement of that particular right committed while he or she is the owner of it." *Id.*; *see also Silvers v. Sony Pictures Entm't, Inc.*, 402 F.3d 881, 885 (9th Cir. 2005) (en banc).  Although

"copyrights are divisible," and can be freely transferred, *Corbello v. DeVito*, 777 F.3d 1058, 1065 (9th Cir. 2015), the question of standing to sue depends on the nature of the interest transferred.  In the case of joint ownership of exclusive rights in copyright, for example, "when one co-owner independently attempts to grant an exclusive license of a particular copyright interest, that licensee . . . does not have standing to sue alleged third-party infringers." *Id.* (citing *Sybersound Records, Inc. v. UAV Corp.*, 517 F.3d 1137, 1146 (9th Cir. 2008)).  The *Corbello* court reasoned:

> After all, one co-owner, acting independently, "may not limit the other co-owners' independent rights to exploit the copyright." . . . Such a conclusion stems from the self-evident principle that a joint-owner cannot transfer more than he himself holds; thus, an assignment or exclusive license from one joint-owner to a third party cannot bind the other joint-owners or limit their rights in the copyright without their consent.  In other words, the third party's right is "exclusive" as to the assigning or licensing co-owner, but not as to the other co-owners and their assignees or licensees.  As such, a third-party assignee or licensee lacks standing to challenge the attempted assignments or licenses of other copyright owners.

*Id.* (citing *Sybersound*, 517 F.3d at 1146).[2]

---

[2] Looking to the circumstances of that case, we held that the transferred interest there "constituted a transfer of [a co-owner's] derivative-work interest in the copyright, rather than a license."

Tresóna received its copyright interests in the songs "(I've Had) The Time of My Life," "Hotel California," and "Don't Phunk With My Heart," as a license from an individual co-owner of those interests without the consent of the other co-owners.  Under *Corbello* and *Sybersound*, therefore, Tresóna lacks standing to sue for infringement of its non-exclusive rights.  Tresóna does not contend otherwise, but argues that a later panel decision, *Minden Pictures, Inc. v. John Wiley & Sons, Inc.*, 795 F.3d 997 (9th Cir. 2015), abrogated the holdings in *Corbello* and *Sybersound* that a licensee of only one co-owner's interests lacks standing to bring claims for infringement under the Copyright Act.

Of course, even if *Minden Pictures* purported to overrule *Sybersound* and *Corbello*, it could not do so, for "[o]nce a panel resolves an issue in a precedential opinion, the matter is deemed resolved, unless overruled by the court itself sitting en banc, or by the Supreme Court."  *Hart v. Massanari*, 266 F.3d 1155, 1171 (9th Cir. 2001).  "[A] later three-judge panel considering a case that is controlled by the rule announced in an earlier panel's opinion has no choice but to apply the earlier-adopted rule; it may not any more disregard the earlier panel's opinion than it may disregard a ruling of the Supreme Court."  *Id.*  Therefore, the three-judge panel in *Minden* could not have overruled *Sybersound* and *Corbello*'s holdings even if it wanted to.

But *Minden Picture*s did not purport to overrule *Sybersound* or *Corbello*.  It did not even address the issue

---

*Corbello*, 777 F.3d at 1066.  We made clear that a co-owner of a copyright is free to transfer that ownership interest to another, as long as the transfer was only of "exclusive copyright interests that [the co-owner itself] possesses."  *Id.*

presented in both cases: whether a co-owner of a copyright interest can unilaterally grant an exclusive license to that interest to a third party. In *Minden Pictures*, "a stock photography company that serves as [a] licensing agent for dozens of photographers" granted rights to third parties to use copyrighted photographs. 795 F.3d at 999–1000. Although Minden Pictures had the exclusive right to act as their licensing agent, the photographers had retained the rights both to "use the photographs themselves and to license them to others." *Id.* at 999. Minden Pictures sued its licensee, a textbook publisher, for copyright infringement, claiming that the publisher exceeded the terms of its licensed use of the photographic works. *Id.* at 1000–01. The question before us was whether Minden Pictures had statutory standing to sue the publisher. Despite the fact that Minden Pictures had received licenses from the sole owners of the copyright interests, rather than from co-owners of those interests, the publisher argued that Minden Pictures did not receive exclusive licenses from the photographers, as the photographers retained the right to issue licenses themselves. *Id.* at 1004. But, as we pointed out, Minden Pictures had received an exclusive right to act as the licensing agent for each of the individual photographers, which was a grant of rights vis-à-vis the world. Even if that exclusive right was shared with the photographers, Minden Pictures would still have standing to sue over infringement of its license. As we there reasoned:

> The reason the [Copyright] Act prevents a holder of a "nonexclusive license" to use a copyrighted photograph from bringing an infringement action against others who use the same photograph is that such a licensee has no more than "a privilege that protects him from a claim of infringement by the

> owner" of the copyright. That is, because such a licensee has been granted rights only vis-à-vis the licensor, not vis-à-vis the world, he or she has no legal right to exclude others from using the copyrighted work, and thus no standing to bring an infringement suit. But when a licensee has been granted rights vis-à-vis the world—even if he or she shares those rights with another party, including the owner of the copyright—we see nothing in the Copyright Act that requires us to deem such an arrangement a mere "nonexclusive license" insufficient to give rise to standing to sue.

*Id.* (citations omitted).

We accordingly saw "no reason why, having appointed Minden [Pictures] to manage the commercial use of their photographs in the first instance as their licensing agent, the photographers should not also be able to rely on Minden [Pictures] to protect and defend the licenses that it has issued on their behalf." *Id.* at 1005. In other words, even if an exclusive right is shared between two entities, a sole owner can promise exclusivity to just those two, while a co-owner cannot make that same promise unilaterally. Because the issue of whether a co-owner of a copyright interest can unilaterally grant an exclusive license to that interest was not present in *Minden Pictures*, Tresóna's reliance on *Minden Pictures* is misplaced.

The district court correctly held that Tresóna lacked standing under 17 U.S.C. § 501(b) to bring copyright infringement claims based on the songs "(I've Had) The Time of My Life," "Hotel California," and "Don't Phunk

With My Heart," as Tresóna received its interests in those songs from individual co-owners of copyright, without the consent of the other co-owners, and therefore held only non-exclusive licenses in those works.

## IV.  FAIR USE

We affirm the district court's grant of summary judgment against Tresóna on its claim of infringement of "Magic," but not on the ground of qualified immunity. From the outset of this litigation, Carroll asserted the defense of fair use, and on cross-motions for summary judgment Tresóna sought a ruling that there was no fair use.[3] The district court, however, ruled in favor of Carroll on qualified immunity grounds, holding that "since teaching is *explicitly* listed as fair use [in the Copyright Act], a public school teacher acting in his teaching capacity would be reasonable in believing the fair use defense applies." It thus elided the question of whether Carroll's use of a rearranged segment of a copyrighted musical work in the arranged show music was an infringement. But that question begs to be answered, for show choirs and the arrangements they perform are not limited to public schools where the defense of qualified immunity might be invoked by public school teachers. And the defense of fair use, if applicable, should cover "teaching" whether in a private or public setting. Moreover, the fair use defense renders a use noninfringing, and has long served as an important defense in copyright law, unlike the qualified immunity defense which has never been used in our circuit

---

[3] The Booster's Club also asserted the defense of fair use.

or by the Supreme Court to shield a public official from a copyright infringement action.**[4]**

First recognized by United States courts in 1841, *see Folsom v. Marsh*, 9 F. Cas. 342, 348  (C.C.D. Mass. 1841) (No. 4901), the fair use doctrine is an "equitable rule of reason," *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 448 (1984), that "permits courts to avoid rigid application of the copyright statute when, on occasion, it would stifle the very creativity which that law is designed to foster," *Stewart v. Abend*, 495 U.S. 207, 236 (1990) (quoting *Iowa State Univ. Research Found., Inc. v. Am. Broad. Cos.*, 621 F.2d 57, 60 (2d Cir. 1980)).  In *Folsom*, Justice Story formulated the issue of fair use as a question of "whether this is a justifiable use of the original materials, such as the law recognizes as no infringement of the copyright of the plaintiffs," 9 F. Cas. at 348, and he identified many of the factors that continue to guide our analysis today: "the nature and objects of the selections made, the quantity and value of the materials used, and the degree in which the use may prejudice the sale, or diminish the profits, or supersede the objects, of the original work." *Id.*  Although Congress has amended federal copyright law numerous times in our history since the original statute was enacted in 1790, it first codified the fair use doctrine in section 107 of the Copyright Act of 1976.  In so doing, Congress sought to restate the judicial doctrine of fair use in section 107, "not to change, narrow, or enlarge it in any way."  H.R. Rep. No. 94-1476, at 66 (1976).  Congress, however, acknowledged that "courts

---

**[4]** Professor Nimmer has recognized that "[s]ome courts have applied [the qualified immunity] doctrine in the copyright context, [while] others on occasion have denied it," without endorsing either approach. *See* 3 Melville B. Nimmer & David Nimmer, Nimmer on Copyright § 12.01[E][2][b] (2019).

must be free to adapt the [fair use] doctrine to particular situations on a case-by-case basis." *Id.*

In section 107, Congress first provides examples of traditionally noninfringing uses of copyright:

> [n]otwithstanding the provisions of sections 106 and 106A, the fair use of a copyrighted work, including such use by reproduction in copies or phonorecords or by any other means specified by that section, for purposes such as criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship, or research, is not an infringement of copyright.

Congress then lists four nonexclusive "factors to be considered" in determining whether an unauthorized use is infringing:

> (1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;
>
> (2) the nature of the copyrighted work;
>
> (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and
>
> (4) the effect of the use upon the potential market for or value of the copyrighted work.

*Id.*

We first look to whether the allegedly infringing use falls into the categories of uses given by Congress as examples of noninfringing uses. *See Leadsinger, Inc. v. BMG Music Publ'g*, 512 F.3d 522, 530 (9th Cir. 2008); 4 Nimmer § 13.05[A][1][a] (explaining the importance of the preamble examples to the fair use analysis). We then turn to the nonexclusive list of factors, looking not only to the statutory language of section 107 but also to prior judicial decisions addressing the contours of fair use. *See Campbell v. Acuff Rose Music Inc.*, 510 U.S. 569, 577 (1994) ("Congress meant § 107 to restate the present judicial doctrine of fair use, not to change, narrow, or enlarge it any way." (quotation omitted)). We analyze these factors together in light of the purpose of copyright law, *see id.* at 578, keeping in mind that copyright's limited grant of monopoly privileges ultimately furthers the public good by "promot[ing] the Progress of Science and useful Arts," U.S. Const. art. I, § 8, cl. 8; *see also Harper & Row, Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 546 (1985). We also closely examine the particular facts presented by this case because the fair use analysis is a factually driven one.

Carroll's use of the musical work was in his capacity as a teacher in the music education program at Burbank High School. Such an educational use weighs in favor of fair use. But that does not end our inquiry because the preamble's "text employs the terms 'including' and 'such as' . . . to indicate the 'illustrative and not limitative' function of the examples given." *Campbell*, 510 U.S. at 577 (quoting 17 U.S.C. § 101). We next analyze and weigh the listed factors.

A.  The Purpose and Character of the Use, Including Whether Such Use Is of a Commercial Nature or Is for Nonprofit Educational Purposes

We first look to "the purpose and character of the use." 17 U.S.C. § 107(1).  Josh Greene's arrangement of segments from several musical works, including the chorus from "Magic," was for "nonprofit educational purposes," *id.*, and the resulting work was transformative.   Greene's new arrangement became an eighteen-minute-long competitive choir show, "Rainmaker," that included the rearranged chorus of "Magic."  It was performed by students as part of Burbank's music education program.  Part of the proceeds went to the nonprofit Boosters Club to support other aspects of the music education program and the work of the show choir.  This use was not of a traditional commercial nature, but rather for the nonprofit education of the students in the music program.[5]   Carroll distributed the sheet music arranged by Greene at no charge to the students.  *See Marcus v. Rowley*, 695 F.2d 1171, 1175 (9th Cir. 1983) (finding a nonprofit educational purpose in a teacher's copying of a

---

[5] This case is thus far removed from those circumstances previously held to have a commercial purpose.  *See, e.g., Campbell*, 510 U.S. at 582–83 (rap song parody sold to the public); *Disney Enters., Inc. v. VidAngel, Inc.*, 869 F.3d 848, 861 (9th Cir. 2017) (paid streaming service that filtered objectionable content from movies and television shows); *Seltzer v. Green Day, Inc.*, 725 F.3d 1170, 1178 (9th Cir. 2013) (use of an image in the video backdrop of Green Day's musical tour); *SOFA Entm't, Inc. v. Dodger Prods.*, 709 F.3d 1273, 1278–79 (9th Cir. 2013) (use of a television clip in the stage musical *Jersey Boys*); *Leadsinger*, 512 F.3d at 530 (explaining the plaintiffs' "commercial [purpose] . . . to sell its karaoke device for profit").

cake decorating booklet and distribution to students at no charge).

However, "the mere fact that a use is educational and not for profit does not insulate it from a finding of infringement." *Campbell*, 510 U.S. at 584; *Marcus*, 695 F.2d at 1175. "The central purpose of this investigation is to see, in Justice Story's words, whether the new work merely 'supersede[s] the objects' of the original creation or instead adds something new, with a further purpose or different character, altering the first with new expression, meaning, or message; it asks, in other words, whether and to what extent the new work is 'transformative.'" *Campbell*, 510 U.S. at 579 (alteration in original) (citations omitted). Works are transformative when "new expressive content or message is apparent," even if "the allegedly infringing work makes few physical changes to the original or fails to comment on the original." *Seltzer v. Green Day, Inc.*, 725 F.3d 1170, 1177 (9th Cir. 2013). "[T]he more transformative the new work, the less will be the significance of other factors . . . ." *Campbell*, 510 U.S. at 579.

"Magic" was an original song in the 1980 musical movie fantasy "Xanadu." Olivia Newton-John played Kira, a muse descended from Mount Olympus, who encourages and inspires the male protagonist, Sonny, to pursue his dream of opening a fantastical nightclub, Xanadu. "Magic" plays during their first encounter, reprises first when Kira must return to Olympus, and then again when Kira seemingly reappears as a Xanadu waitress. It is thus used as a vehicle of inspiration for pursuit of one's dreams and love.

"Rainmaker" is an entirely different theatrical work—a show piece for the high school choir that reworks pieces from multiple songs to tell a story with new expressive content and meaning. "Rainmaker" tells the story of a local

Dust Bowl-era community ravaged by drought. After a stranger visits the town, he promises rain in return for faith in his magical powers and performs several miracles to encourage the townspeople to believe in him. When the town's last holdout, the Sheriff, drops to his knees to proclaim his faith, lifesaving rain finally arrives. The townspeople celebrate the newfound rain, singing the rearranged chorus of "Magic," including additional, new lyrics.

This rearrangement of "Magic" along with other musical works was thus transformative. Greene did not "simply omit[] portions" of the original work while retaining the "same intrinsic entertainment value." *Disney Enters., Inc. v. VidAngel, Inc.*, 869 F.3d 848, 861 (9th Cir. 2017). Rather, "Rainmaker" uses a portion of "Magic" by adding "new expression, meaning, [and] message." *Campbell*, 510 U.S. at 579; *see also Seltzer*, 725 F.3d at 1176–77 (finding the use of a street art image transformative when it is used in a four-minute video to comment on religion); *Cariou v. Prince*, 714 F.3d 694, 708 (2d Cir. 2013) (holding the use of photographs in a series of paintings was transformative because the changes resulted in a "fundamentally different aesthetic"); *SOFA Entm't, Inc. v. Dodger Prods.*, 709 F.3d 1273, 1278 (9th Cir. 2013) ("By using [a TV clip] as a biographical anchor, [Defendant] put the clip to its own transformative ends."); *L.A. News Serv. v. CBS Broad., Inc.*, 305 F.3d 924, 939 (9th Cir. 2002) (finding transformative the inclusion of a video clip within a longer montage and edited for dramatic effect). Because Greene's rearrangement of a portion of "Magic" created a new work with new meaning, it was a transformative use. *Seltzer*, 725 F.3d at 1177.

The "purpose and character" factor of the use of "Magic" weighs strongly in favor of a finding of fair use.

## B.  The Nature of the Copyrighted Work

In analyzing the second factor, "the nature of the copyrighted work," we examine "whether the work is informational or creative." *Worldwide Church of God v. Phila. Church of God, Inc.*, 227 F.3d 1110, 1118 (9th Cir. 2000).  We keep in mind "that creative works are 'closer to the core of intended copyright protection' than informational and functional works." *Dr. Seuss Enters. v. Penguin Books USA, Inc.*, 109 F.3d 1394, 1402 (9th Cir. 1997) (quoting *Campbell*, 510 U.S. at 586).  Because the original arrangement of the song "Magic" is undoubtedly creative, this factor weighs against a finding of fair use.  *See Leadsinger*, 512 F.3d at 531 (recognizing that "[o]riginal song lyrics are a work of creative expression").

## C.  The Amount and Substantiality of the Portion Used in Relation to the Copyrighted Work as a Whole

The third factor examines whether "the amount and substantiality of the portion used in relation to the copyrighted work as a whole . . . [is] reasonable in relation to the purpose of the copying." *Campbell*, 510 U.S. at 586. "[W]e recognize that the extent of permissible copying varies with the purpose and character of the use." *Id.* at 586–87; *see* 4 Nimmer § 13.05[A][3] ("The proper analysis here includes a determination of not just quantitative, but also qualitative substantiality.").  As a result, "this factor necessarily overlaps somewhat with the first factor." *Seltzer*, 725 F.3d at 1178.  "If the secondary user only copies as much as is necessary for his or her intended use, then this factor will not weigh against" fair use. *Kelly v. Arriba Soft Corp.*, 336 F.3d 811, 820–21 (9th Cir. 2003).

Here, the segment taken from the song "Magic" is approximately twenty seconds of a four-minute and twenty-two second song.  The portion that was used, however, incorporates the song's principle chorus, which is the central element of the musical work, and is repeated more than once.  Thus, the copied portion is undoubtedly a qualitatively significant portion of "Magic."  *See Campbell*, 510 U.S. at 587–89.  However, as the Supreme Court has explained in discussing both parody and news reporting, "context is everything, and the question of fairness asks what else the [copier] did besides go to the heart of the original."  *Id.* at 589.  Even "entire verbatim reproductions are justifiable where the purpose of the work differs [enough] from the original." *Mattel, Inc. v. Walking Mountain Prods.*, 353 F.3d 792, 803 n.8 (9th Cir. 2003) (citing *Kelly*, 336 F.3d at 821).

In this case, Greene's rearrangement did not simply copy several lines from one chorus of the song and repeat it, but embedded that portion into a larger, transformative choir showpiece that incorporated many other works, and imbued that entire piece with new expression and meaning not contained within any of the individual works.  Carroll thus "departed markedly from" the original lyrics, *Campbell*, 510 U.S. at 589, incorporating the chorus of "Magic" into a new and different story that also furthered high school students' musical learning and development.  The new work is not a verbatim copy, nor one in which the transformative use "is so insubstantial, as compared to the copying, that the third factor must be resolved as a matter of law against the [Defendants]." *Id.*

In light of Carroll's non-profit educational and transformative use of "Magic," the amount and substantiality of the portion used does not weigh against of fair use.

D.  The Effect of the Use Upon the Potential Market for or
Value of the Copyrighted Work

The fourth factor, "the effect of the use upon the potential market for or value of the copyrighted work," 17 U.S.C. § 107(4), requires us "to consider not only the extent of market harm caused by the particular actions of the alleged infringer, but also whether unrestricted and widespread conduct of the sort engaged in by the defendant would result in a substantially adverse impact on the potential market for the original," *Campbell*, 510 U.S. at 590 (alterations and quotations omitted). "This inquiry must take account not only of harm to the original but also of harm to the market for derivative works." *Harper & Row*, 471 U.S. at 568. When, as here, a use is plainly transformative, "market substitution is at least less certain, and market harm may not be so readily inferred." *Campbell*, 510 U.S. at 591.

Carroll and the Boosters Club submitted uncontroverted evidence that the sheet music incorporating twenty seconds of "Magic" was used only by students and their accompanists during the show choir's extracurricular activities as part of their performance of a new work. Although the creation of sheet music incorporating the copyrighted work is a derivative use, the twenty seconds used in the "Rainmaker" choir piece is not a substitute for the song "Magic." *See SOFA Entm't*, 709 F.3d at 1280 ("Where the secondary use is not a substitute for the original and does not deprive the copyright holder of a derivative use, the fourth factor weighs in favor of fair use.").

As Professor Nimmer explains, "if, regardless of medium, defendant's work performs a different function from plaintiff's, then notwithstanding its use of substantially similar material, the defense of fair use may prevail." 4 Nimmer § 13.05[B][1]. Fair use exists when "[t]hose

interested in obtaining plaintiff's music for musical purposes would not find their need fulfilled by purchasing" the defendant's allegedly infringing work. *Id.*; *cf. Campbell*, 510 U.S. at 591 (explaining that parody is not likely to substitute for an original work because the two "usually serve different market functions"). A consumer interested in acquiring sheet music for "Magic" would not purchase the sheet music for "Rainmaker," as it omits much of the song except the chorus, and even the portions that are included are substantially rearranged. Similarly, a person wishing to purchase the sheet music for "Magic" in order to play or perform that song would necessarily purchase the sheet music for the song itself from the owner of the performance rights—not the sheet music for "Rainmaker." *See Kelly*, 336 F.3d at 821–22 (finding no market harm where a person could not use the allegedly infringing work, a thumbnail photograph, as a substitute for the copyrighted high-resolution photograph); *L.A. News Serv.*, 305 F.3d at 941 (finding a transformative use of a news clip on Court TV "quite unlikely to affect the relevant market"). Thus, the use of "Magic" in "Rainmaker" does not affect the consumer market for the sheet music in the song at all. It is difficult to see how even widespread and unrestricted use of the chorus, in the context of nonprofit show choir performances, could displace the market for sheet music for the entire song.

Of course, "it is a given in every fair use case that plaintiff suffers a loss of a *potential* market if that potential is defined as the theoretical market for licensing the very use at bar." 4 Nimmer § 13.05[A][4]; *see also* Pierre N. Leval, *Toward a Fair Use Standard*, 103 Harv. L. Rev. 1105, 1124 (1990) ("By definition every fair use involves some loss of royalty revenue because the secondary user has not paid royalties."). However, "a copyright holder cannot prevent others from entering fair use markets merely 'by developing

or licensing a market for parody, news reporting, educational, or other transformative uses of its own creative work.'"  *Bill Graham Archives v. Dorling Kindersley Ltd.*, 448 F.3d 605, 614–15 (2d Cir. 2006) (quoting *Castle Rock Entm't Inc. v. Carol Publ'g Grp.*, 150 F.3d 132, 145 n.11 (2d Cir. 1998)).  Nor does the decision by secondary users to pay, or not pay, establish whether fair use exists.  *See Campbell*, 510 U.S. at 585 n.18.  Because the use in this case "falls within a transformative market," Tresóna was not harmed by the loss of any fees for the licensing of the song "Magic."  *Bill Graham Archives*, 448 F.3d at 615.

## E.  Conclusion

We weigh each of these factors in light of the Copyright Act's purpose "to stimulate artistic creativity for the general public good."  *Twentieth Century Music Corp. v. Aiken*, 422 U.S. 151, 156 (1975).  The educational use of "Magic" falls into an enumerated fair use purpose and three of the four factors we consider are neutral or weigh in favor of finding that Defendants' use of "Magic" was fair use.  We are especially swayed here by the limited and transformative nature of the use and the work's nonprofit educational purposes in enhancing the educational experience of high school students.  We conclude that Carroll's use of a small portion of the song "Magic," along with portions of other songs, to create sheet music for a new and different high school choir showpiece performance was a fair use.[6]

---

[6] Because we affirm the district court's grant of summary judgment as to Carroll on the alternative ground of fair use, we also affirm the district court's grant of summary judgment on Tresóna's claim for vicarious copyright infringement against the Boosters Club and parents on this ground.  *See Fox Broad. Co., Inc. v. Dish Network, LLC*, 747 F.3d 1060, 1068 (9th Cir. 2014) ("Secondary liability for copyright

## V.  ATTORNEYS' FEES

The district court denied attorneys' fees to Defendants because it granted summary judgment on grounds of standing and qualified immunity, procedural issues it found unrelated to the purposes of copyright.  Having declined to rule on the critical question of fair use, the district court found that Defendants' status as the prevailing party did not weigh as heavily toward an award of attorneys' fees.  But Defendants' fair use defense, upon which we rely in part today, goes to the heart of the copyright dispute in this case.  Indeed, even in its qualified immunity ruling, the district court analyzed fair use to the extent that it found that it was reasonable for Carroll to believe that his use was noninfringing.

Under section 505 of the Copyright Act, a district court may award a "reasonable attorney's fee" and costs to the prevailing party.  *See* 17 U.S.C. § 505.  "[D]efendants who seek to advance a variety of meritorious copyright defenses should be encouraged to litigate them to the same extent that plaintiffs are encouraged to litigate meritorious claims of infringement."  *Fogerty v. Fantasy, Inc.*, 510 U.S. 517, 527 (1994).  The touchstone of the decision to award attorneys' fees is whether the successful defense, and the circumstances surrounding it, further the Copyright Act's "essential goals." *Kirtsaeng v. John Wiley & Sons, Inc*, 136 S. Ct. 1979, 1989 (2016).  Courts "may consider (but [are] not limited to) five factors in making an attorneys' fees determination . . . (1) the degree of success obtained, (2) frivolousness, (3) motivation, (4) [objective] reasonableness of [the] losing

_____

infringement does not exist in the absence of direct infringement by a third party." (quoting *A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1013 n.2 (9th Cir. 2001))).

party's legal and factual arguments, and (5) the need to advance considerations of compensation and deterrence." *Wall Data Inc. v. L.A. Cty. Sheriff's Dep't*, 447 F.3d 769, 787 (9th Cir. 2006). Substantial weight should be accorded to the fourth factor. *Shame On You*, 893 F.3d at 666 (citing *Kirtsaeng*, 136 S. Ct. at 1985, 1989).

Defendants prevailed across the board in this action in the district court and won a ruling on their fair use defense on appeal. This complete success weighs in favor of an award of attorneys' fees. *See id.* at 667; *Glacier Films (USA), Inc. v. Turchin*, 896 F.3d 1033, 1038 (9th Cir. 2018). Although the district court properly noted that a fee award is less justified when "copyright defendants do not . . . reach the merits, prevailing instead on technical defenses," *Fantasy, Inc. v. Fogerty*, 94 F.3d 553, 560 (9th Cir. 1996), Defendants have now prevailed on their defense of fair use, a substantive defense at the heart of copyright law. As we have previously recognized, "[w]hen a fee award encourages a defendant to litigate a meritorious fair use claim against an unreasonable claim of infringement, the policies of the Copyright Act are served." *SOFA Entm't*, 709 F.3d at 1280.

We examine objective reasonableness next, because that factor is given "substantial" weight. *Shame On You*, 893 F.3d at 666. While "a legal argument that loses is not necessarily unreasonable," *id.*, this is not "a close and difficult case," *Seltzer*, 725 F.3d at 1181. Rather, Tresóna's arguments are objectively unreasonable. As to standing, Tresóna should have known that *Sybersound* rendered its chances of prevailing on three of the four songs remaining at summary judgment "slim to none." *SOFA Entm't*, 709 F.3d at 1280. Tresóna's argument that *Minden Pictures* overruled *Sybersound* ignored the significant differences between those two cases. The argument was also legally

unreasonable because our opinion in *Minden Pictures* did not purport to overrule *Sybersound*; nor did it address the precise standing issue decided in *Sybersound* and *Corbello*.

Tresóna's fair use argument as to the one song it did have exclusive rights to, "Magic," was likewise objectively unreasonable. *Seltzer*, in which we confronted "a close and difficult case" and found an action for infringement reasonable, is instructive in its differences. 725 F.3d at 1181. There, the band Green Day used a drawing of *Scream Icon*, a screaming, contorted face, in a video backdrop for a commercial concert tour. *Id.* at 1173–74. We explained that the "transformation was far from obvious given Green Day's only slight alterations to the original," and each of the remaining three fair use factors pointed in a different direction: the second factor weighed against fair use, the third was neutral, and the fourth weighed in favor of fair use. *Id.* at 1181. Here, in contrast, the use falls plainly within the enumerated fair use purposes of "teaching" and "nonprofit education[]," 17 US.C. § 107, and the portions of the song taken were used in a highly transformative work.

Tresóna did more than simply pursue an aggressive litigation strategy. It sued a public school teacher, a not-for-profit Boosters Club, and parent volunteers. Both during litigation, and in pre-litigation communications with Carroll, Tresóna repeatedly mischaracterized its copyright interests in the songs at issue by claiming to be the sole entity empowered to issue licenses. In light of Tresóna's minimal and belatedly produced evidence supporting its claimed chain-of-title, these communications appear specifically designed to frighten Carroll and the Boosters Club into purchasing licenses from Tresóna, rather than to legitimately enforce its limited licensing interests or those of the true copyright owners. Indeed, Tresóna's initial complaint

alleged exclusive rights in 79 songs used by the Burbank show choirs. And it was not until after briefing on Carroll's summary judgment motion was complete that Tresóna belatedly produced any evidence of its chain of title, which demonstrated its claimed interests were almost entirely unsubstantiated. None of these actions furthers the purposes of the Copyright Act. *SOFA Entm't*, 709 F.3d at 1280–81.

Courts have a legitimate interest in deterring the type of litigation conduct in which Tresóna engaged, and in compensating those who have been harmed by such conduct. Although the district court noted that it "[did] not believe that [Tresóna] will groundlessly reassert these claims," the basis for that finding is unclear. Tresóna groundlessly asserted at least three claims of infringement in this very case, while simultaneously representing that it could have brought many more such claims. And while, after almost four years of litigation, Tresóna turned out to have standing as to the fourth remaining claim of infringement, it lost both in the district court and on appeal on two independent legal theories. As much of this litigation was avoidable from the beginning based on settled law when Tresóna filed its complaint, awarding attorneys' fees to Defendants appropriately serves the interest in deterrence. *See Kirtsaeng*, 136 S. Ct. at 1987 (explaining that awarding fees encourages "[t]he copyright holder with no reasonable infringement claim . . . not to bring suit in the first instance").

Awarding Defendants their attorneys' fees insures that they are properly compensated for defending against overreaching claims of copyright infringement and pressing a defense that benefits those educating our youth. An award of attorneys' fees here assures that "an overzealous monopolist [cannot] use his copyright to stamp out the very

creativity that the [Copyright] Act seeks to ignite," *SOFA Entm't*, 709 F.3d at 1278, allowing for greater breathing room for classroom educators and those involved in similar educational extracurricular activities.

The district court abused its discretion in denying Defendants' motion for attorneys' fees. We therefore award Defendants' attorneys' fees and remand to the district court for the calculation of the award. *See Mag Jewelry Co. v. Cherokee, Inc.*, 496 F.3d 108, 124 (1st Cir. 2007) (reversing the district court's denial of fees and remanding for the calculation of the amount).

## VI.  CONCLUSION

We affirm the grant of summary judgment in favor of Defendants but reverse the denial of attorneys' fees under 17 U.S.C. § 505.

Costs on appeal shall be awarded to Defendants.

**AFFIRMED IN PART; REVERSED IN PART; REMANDED.**